THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HILLARD NEELEY, a/k/a HILLARD NEELY, *et al.,* Defendants-Appellants.

(Nos. 57595, 58588 cons.;

First District (1st Division)—March 11, 1974.

Allan A. Ackerman, of Chicago, for appellant Hillard Neeley.

James J. Doherty, Public Defender, of Chicago (Alan David Eckstein, Assistant Public Defender, of counsel), for appellant Edward Adams.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURKE delivered the opinion of the court:

The defendants were found guilty by a jury of the offense of armed robbery. Defendant Neeley was also found guilty of rape. Each defendant was sentenced to a term of 4 to 6 years in the penitentiary. The defendants appeal. The appeals have been consolidated.

On July 9, 1971, at approximately 10:30 P.M., Elzada Williams and her sister, Vera Gardner, left their aunt's house and were walking on Homan Avenue near Garfield Park. They were accosted by four male persons. One assailant approached Elzada from behind and put a razor to her throat. Another threatened Vera Gardner with a knife. The women were forced to walk into the park and sit on adjacent benches. Each woman was accompanied by two offenders. The women's purses were taken, searched and thrown in a nearby garbage can. Elzada Williams was led to a bushy area of the park and forced to engage in sexual intercourse with her assailants. The attackers then directed Vera Gardner to help her sister dress. The women were with their assailants for about 1 hour and 20 minutes. The four men ran away and the women unsuccessfully sought help at a nearby gas station. They then returned to their aunt's home, from which the police were summoned. The women went back to the park with the police. Their purses were found in the garbage can.

After this, the women were taken to County Hospital, where Elzada was examined.

The following day, Vera Gardner and her husband were out shopping when Vera noticed a group of young men on the corner of Franklin Boulevard and Kedzie Avenue. She thought that the four attackers were among them. After circling the block in their car several times to be sure of her identification, Vera and her husband went in search of the police. When they returned to the corner, however, the four were not there. Later that day she spotted one of the assailants on the corner of Fulton and Kedzie. While she was talking to him, defendant Neeley and another person whom Vera recognized from the night before joined them. Vera sent for her sister, who came over and agreed with Vera's identification of the three as their assailants. The police were called and the three were arrested. Defendant Adams was arrested on July 12, 1971, after Vera saw him enter a second floor apartment in her building.

Elzada Williams testified that after she was grabbed from behind, she saw defendant Adams with his arm around Vera's waist. She stated that when they reached the benches in the park, defendants Adams and Neeley were with Vera. The two other assailants, both juveniles, were with Elzada. One of the juveniles took her purse, which contained $5, 2 weeks' worth of CTA tokens and a watch, all of which were missing when the purse was recovered from the garbage can. She saw Neeley take Vera's purse to the garbage can. She said the two juveniles walked her deeper into the park, where, at razor-point, she was forced to undress. The two juveniles raped her. While one juvenile was still on top of Elzada, Vera was brought over to them. Then a juvenile and Neeley took Vera away and Elzada was left with the other juvenile and defendant Adams. She said that "* * * he took his turn and then one of them left and then McNeeley [sic] came over." She testified that Neeley then had intercourse with her, during which Vera was returned to the area. When Neeley was finished, Vera was told to help Elzada dress.

Vera Gardner testified that while walking on Homan Avenue someone grabbed her and she felt, rather than saw, him put a knife to her side. She saw someone grab Elzada around the neck. She identified Adams as the one who grabbed her (Vera) and immediately took her purse. She identified defendant Neeley as the one walking on the other side of her. They walked to the benches and Adams asked for the rest of her money. She denied having more than the approximately $50 in her purse. She stated that Neeley searcher her purse and said he would leave her no money to call the police. After the two juveniles took Elzada away, Vera saw the knife held by Adams; she said it was a dagger, between 8 and 12 inches long. She was brought by Adams and Neeley to where

Elzada was. One of the juveniles was on Elzada. Vera begged them not to rape the women. Adams said they would not, and Adams and Neeley took Vera to another section of the park. She told them that she had recently had surgery and begged them not to rape her. One of the juveniles came over to them and stayed while Adams left. The other juvenile came over and Neeley went in the direction of Elzada. Vera was then taken back to Elzada, and she saw Neeley on top of Elzada, "moving as if he was having sexual intercourse." She identified the two juveniles and Neeley the following day as her attackers, and she called the police when she saw Adams enter a nearby apartment.

The defendants both asserted alibi defenses. As to defendant Neeley, Patricia Brown testified that she arrived at the home of Mary Wright, Neeley's girl friend, at about 8:30 P.M. on July 9. Neeley was there. Patricia left at about 9:30 P.M. Neeley's mother testified that Neeley and Mary Wright arrived at the Neeley home at about 11:30 P.M. on July 9. Neeley's sister testified that she arrived home about 12:30 that night and Neeley was there with Mary Wright and Neeleys' mother. All three women testified that Neeley's clothing was not disarranged.

As to defendant Adams, Carol Jackson, his sister, testified that Adams went out about 6 or 6:30 P.M. on July 9 and returned home with his girl friend at about 9 P.M. She stated that he played cards with her and their mother for a good while, after which they played records and watched television. Carol went to her home about 11:30 P.M. Adams' uncle testified that Adams went out at about 6 or 7 P.M. on July 9 and returned alone about 10 P.M. He said that Adams' girl friend had been at the Adams home all day. He further testified that the following day he shaved Adams' head. Carol Jackson had testified that Adams was home on leave from the navy and that he had a mustache and a military haircut on July 9. Adams' mother testified that Adams went out at 6 P.M. and returned at 9 P.M. She said that Adams went to bed at 11 P.M. and his girl friend came over after he went to bed. She stated that his clothes when he returned to the house looked as they had when he left. She testified that his hair was cut on the following day.

Defendant Adams argues that the identification evidence, coupled with his alibi defense, raises a reasonable doubt of his guilt. He notes that neither victim mentioned certain of his distinguishng characteristics in describing her assailants to the police on the night of the attack. Specifically, neither mentioned that one assailant had a shaved head and a mustache, although Adams had a military haircut and mustache on July 9. At trial the two women testified that Adams had a shaved head or was almost bald on the night of the attack, and they both said they could

not remember him having a mustache. When he was arrested on July 12, Adams had both a shaved head and a mustache.

■■■ It is settled that precise accuracy in describing facial characteristics, including the presence of a mustache, is unnecessary if the identification is positive. (*People v. Catlett*, 48 Ill.2d 56, 268 N.E.2d 378.) The identification testimony in this case was positive. The women were with their attackers for about an hour and 20 minutes. They were accosted on a lighted street. In spite of defense counsel's somewhat confusing use of number designations instead of names for the assailants on cross-examination, the women unswervingly identified defendants Adams and Neeley as the persons who attacked them.

■■ Defendant Adams argues that the women's failure to notice his mustache raises a reasonable doubt of his guilt. It has been held that failure to notice a mustache discredits identification testimony, because a mustache is something which is not normally overlooked. (*People v. Marshall*, 74 Ill.App.2d 483, 221 N.E.2d 133.) The record in this case indicates that defendant Adams' mustache was not easily perceived. His uncle, who testified for him, was unsure at trial whether his nephew had a mustache. To determine whether he did have one, the uncle left the stand to observe his nephew more closely. There was no evidence that the mustache was more easily discernible on the night of the attack, and the jury could have concluded that the witnesses were justified in not noticing it. The sufficiency of the identification evidence was for the trier of fact to determine. We will not disturb that finding unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Holt*, 124 Ill.App.2d 198, 260 N.E.2d 291.

Vera Gardner testified that she is 5′5″ tall and defendant Adams is the same height. She denied telling a police officer, on the night of the attack that two of the offenders were 5′ tall. Defendant Adams argues that this discrepancy illustrates the weakness of her testimony. We find, however, that whatever discrepancy appears in the testimony was for the jury to assess. The jury here weighed the identification testimony against the alibi defenses. No reasonable doubt is raised by the record in this case. *People v. McGee*, 21 Ill.2d 440, 173 N.E.2d 434.

■■■ The defendants' next argument is that the trial court's refusal to give their proffered instruction on identification deprived them of a statement to the jury of their theory of defense. (*People v. Laczny*, 63 Ill.App.2d 324, 211 N.E.2d 438.) We find, however, as did the Illinois Supreme Court under similar circumstances (*People v. Fox*, 48 Ill.2d 239, 269 N.E.2d 720), that the jury was adequately instructed on the

subject of identification. IPI-Criminal instruction No. 1.02 on credibility of witnesses and No. 2.03 on the presumption of innocence and the State's burden of proof were given to the jury in this case as they were in *Fox*. We also find that the instruction tendered by the defendants violates the spirit of Supreme Court Rule 451(a), relating to the use of non-IPI Criminal instructions (Ill. Rev. Stat. 1971, ch. 110A, par. 451(a)), in that it is not simple, brief, impartial and free from argument. The instruction was properly refused.

Nor do we find any merit in defendant Neeley's argument that the lack of an instruction on alibi denied him a fair trial. The Illinois Supreme Court has approved the recommendation contained in IPI-Criminal instruction No. 24.05 that no instruction on alibi be given. *People v. Poe*, 48 Ill.2d 506, 272 N.E.2d 28.

The defendants argue that they were denied a fair trial by statements made by the prosecutor during voir dire and closing argument. The challenged statement during voir dire was made when a prospective juror, who was later excused by the State, indicated that he wished to know the sentence for the crimes with which the defendants were charged. He stated that he did not believe in long prison sentences. The prosecutor responded:

"Then could you really make a fair and impartial decision not knowing what the sentence will be? Of course, you know it doesn't necessarily have to be a prison term. It could also be probation?"

Defense counsel's objection was overruled, and a proffered instruction to the effect that probation was not possible upon a guilty verdict in this case was refused.

■■ The purpose of voir dire examination is to secure a fair and impartial jury. (*People v. Lobb*, 17 Ill.2d 287, 161 N.E.2d 325.) The Illinois Supreme Court has held that reversal is not required where the potential sentence is revealed to the jury by instruction (*People v. Papke*, 325 Ill. 410, 156 N.E. 375) or before voir dire (*People v. Dewey*, 42 Ill.2d 148, 246 N.E.2d 232), regardless of whether the jury ultimately determines the penalty (*People v. Talbe*, 321 Ill. 80, 151 N.E. 529). Where the possibility of probation has been introduced, however, and the jury may have been influenced in reaching a guilty verdict, the Illinois Supreme Court has ordered the judgment reversed. (*People v. Burgard*, 377 Ill. 322, 36 N.E.2d 558; *People v. Klapperich*, 370 Ill. 588, 19 N.E.2d 579.) Reversal was required although there was no question that probation was in those cases a possible penalty. That is not the case before us. Here the prosecutor misstated the applicable law; he said that probation was a possible penalty following a guilty verdict. The defendants were charged

with rape (Ill. Rev. Stat. 1971, ch. 38, par. 11—1) and armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 18—2). A sentence of probation was not permitted for either offense at the time of trial (Ill. Rev. Stat. 1971, ch. 38, par. 117—1(a)), nor is it possible under the Unified Code of Corrections (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—5—3). We find that the jury, which deliberated the defendants' guilt or innocence in the erroneous belief that probation was a potential penalty, may very well have been influenced by the introduction of the possibility of probation. The Illinois Supreme Court saw fit to order reversal even when a trial judge sustained a defense objection to the prosecutor's statement (regarding probation) and ordered the jury to disregard such statements. (*People v. Burgard*, 377 Ill. 322, 36 N.E.2d 558.) In the case before us, defense counsel's objection was overruled, and defendant Neeley's proffered instruction, to the effect that rape is not a probationable offense, was refused. The trial judge here made no attempt to correct the prosecutor's error. The judge's repeated admonitions that he alone would determine the sentence upon conviction were not enough to remedy the trial error. We are compelled to reverse the judgments and remand the causes for new trial. In view of this decision, we do not consider the defendants' other arguments regarding prosecutorial misconduct.

Judgments reversed and causes remanded with directions.

EGAN, P. J., and HALLETT, J., concur.