THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD Doss, Defendant-Appellant.

(No. 73-130;

Second District (2nd Division)—March 3, 1975.

2

Ralph Ruebner, of State Appellate Defender's Office, of Elgin, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (James W. Jerz, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

The defendant Ronald Doss was convicted of murder in 1967 and was sentenced to death. An appeal from that conviction to the Illinois Supreme Court resulted in an affirmance of the conviction with orders to remand the cause for resentencing. (*People v. Doss,* 44 Ill.2d 541.) On remand, the defendant was resentenced to a period of 75 to 100 years.

Defendant subsequently sought a writ of habeas corpus in the United States District Court. The petition was dismissed and defendant appealed to the United States Court of Appeals, Seventh Circuit. That court reversed defendant's conviction, ordering the district court to issue the writ. *United States ex rel. Doss v. Bensinger* (7th cir. 1972), 463 F.2d 576.

Defendant was subsequently retried in Winnebago County. After a jury finding of guilty, defendant was again sentenced to 75 to 100 years' imprisonment.

He appeals, contending:

1. That the trial court committed reversible error, in allowing the prosecution to confront defendant with physical evidence which had been previously ordered suppressed.
2. That the trial court committed reversible error in failing to instruct the jury on its own motion as to the limited purpose for which the above evidence offered for impeachment could be considered.

4

3. That he was not proved guilty beyond a reasonable doubt.

4. That his sentence is excessive.

An extensive statement of facts appears to be required:

Two unmasked black males entered Marshall's Superette Grocery Store in South Beloit, Illinois, on April 3, 1967, at about 11:45 P.M. They remained in the store about 10 minutes. The men were identified by the owner's wife, Jean Marshall, and a store clerk, Gloria Donath, as Ophem Falconer and Ronald Doss. While in the store, Falconer and Doss robbed the establishment of approximately $700, and during the course of the robbery Falconer shot and killed the owner, Linford Marshall.

### For the People

Jean Marshall, the widow of the decedent, Linford Marshall, testified that she and her husband owned a grocery store in South Beloit, Illinois. On April 3, 1967, the store was open until 12 midnight. Mr. Marshall, Mrs. Marshall and Miss Gloria Donath were working that night. As they were preparing to close the store at about 11:45 P.M., two men entered. Mr. and Mrs. Marshall were behind the counter. Miss Donath was in the basement. Mrs. Marshall identified Ronald Doss as one of the two men. She identified the defendant four times previous to her testimony. She testified that she was positive that the defendant was one of the perpetrators of the crime. Mrs. Marshall identified the other man as Ophem Falconer.

When the men first entered, they went to the rear of the store. Mrs. Marshall was looking at them at that time, and they were no more than 30 feet away from her. The lighting in the store was very good and she was able to see the faces of both men.

Falconer came up and put some fruit on the counter. He then walked back and spoke to the other man. When Falconer returned to the counter Mrs. Marshall heard her husband say "Just a minute." When she looked over, Falconer had a pistol pointed at Mr. Marshall's chest. Mrs. Marshall then heard a shot and Mr. Marshall fell to the floor. As Falconer prepared to fire again Mrs. Marshall grabbed his arm and began to struggle with him. Doss came behind the counter. Mrs. Marshall then heard another shot, and the next thing that she could recall was waking up at the bottom of the basement stairs. Mrs. Marshall had a head wound that required eight stitches.

Approximately $500 was taken from the cash register; $200 was taken from Mr. Marshall's wallet. People's Exhibit 5 was identified by Mrs. Marshall as the pistol that her husband owned and had had in his pocket on April 3, 1967.

On cross-examination, Mrs. Marshall maintained (1) that she could

not recall if defendant was wearing a hat the night of April 3, 1967, (2) that she got a good look at Doss when she was struggling with Falconer, (3) that she did not recall telling an officer that Doss weighed about 130-140 pounds, (4) that on April 4, 1967, she identified both Falconer and Doss in a lineup. Mrs. Marshall did recall telling the officer that the man who did not do the shooting was between 6' and 6'2" tall.

Gloria Donath testified that she had been employed by the Marshalls as a clerk, for about 2 years. On April 3, 1967, just before closing, she was in the basement straightening up the office. At approximately 11:30 P.M., Mr. Marshall came down to the basement to check out some receipts. She testified that when Mr. Marshall went back upstairs, he took his pistol with him.

Upon hearing some scuffling upstairs, she ascended the stairs. When she got to the top of the stairs, Miss Donath observed Mr. Marshall falling. She saw two men. One of the men pointed a gun at her and told her to come out. Miss Donath shut the door. Realizing there was no place to go she opened the door. Mrs. Marshall walked by her and fell down the basement stairs. The man with the pistol then grabbed her, and at his request she opened the cash register. She identified one of the two men as the defendant, Doss. Miss Donath stated that she got a good look at the faces of both men. She said she was as close as 6 feet to Doss. She testified that she identified Doss the next day in a lineup, that she recognized him in another proceeding in this case 5 years previous. "I remember him because he was standing there and when you look at a person and its something like that, it just sticks in your mind."

On cross-examination Miss Donath testified that she observed Doss behind the counter at one point in time and then he moved to the door. She stated that she did not recall receiving a sedative at the hospital and did not recall telling a police officer that Doss was about 6 feet tall and weighed about 130-140 pounds.

John Patton was an acquaintance of both Doss and Falconer. He first saw them on April 3, 1967, around 3:30 P.M., at his home. Besides Doss and Falconer, Speedy Cartwright, Bob Mayfield and Mary Moore were also there.

That afternoon they all went to a gun store in South Beloit. Mayfield purchased shotgun shells. Patton believed that Doss purchased .32-caliber shells. They all went out to a dump in South Beloit and did some target shooting. They were using two guns, a shotgun and either a .32 or .22-caliber pistol. Subsequently they returned to the Patton residence. At approximately 5:30 P.M. Patton heard Doss and Falconer talking about holding up Marshall's Grocery Store. Falconer asked Patton to drive the

getaway car, which he refused to do because Mr. Marshall had given him credit. Doss and Falconer said they would forget it. Patton then drove both of them to the home of Alton Ray.

Patton next saw Falconer and Doss at approximately 12:30 A.M., on April 4, 1967. They knocked on the door, seemed out of breath and asked to be driven to Chicago. Patton refused but consented to drive them to the home of Money DuPree. Patton, Patton's wife, Doss and Falconer then drove to that residence. From there they drove to Alton Ray's and then to Rockford.

Patton testified that as they drove to Rockford he and his wife sat up front, Doss and Falconer sat in the rear. On the way to Rockford they talked about the robbery. Falconer said he had shot Mr. Marshall. Patton did not hear Doss say too much in the car, but did testify that Doss looked "shook up." Along the way Doss and Falconer threw their hats out the window. Falconer said he would take the full responsibility.

After dropping off Doss and Falconer in Rockford near the Tuxedo Club, Patton and his wife were stopped by the police as they proceeded home. Patton gave the police a written statement of what occurred.

On cross-examination Patton was questioned with respect to prior testimony given by him concerning (1) whether Doss and Falconer asked Patton to drive them to Rockford, (2) the type of target practice and who participated and (3) whether Doss or Falconer threw a hat or hats out of the window on the way to Rockford.

Mary Jane Patton is the wife of John Patton. Sometime after midnight on April 4, 1967, Doss and Falconer came to their home which was situated about two blocks from Marshall's Grocery Store. Both men were out of breath; they awakened Mr. Patton and asked him to drive them to Chicago. Together they went to Money DePree's home, then to Falconer's sister's home and then to Rockford.

On the way to Rockford, Falconer said he shot a man and Mrs. Patton believed that Doss stated that he had hit a lady. Mrs. Patton testified that when she made her statement to the police she told them that Doss said that he had hit one of the women over the head.

On cross-examination she was questioned as to who threw the hat out of the car. She stated that she heard no conversation between the men at her house on the afternoon of April 3, 1967.

Robert Keith, a police officer for the city of South Beloit, went to the Marshall Grocery Store with Officer Gerald Hanson shortly before midnight on April 3, 1967. The officer observed that Mr. Marshall had been shot twice. He found no pulse or heartbeat.

On cross-examination the officer described Miss Donath as rather hysterical and badly shaken. The officer's report reflected that at the

hospital Miss Donath was given a sedative and Mrs. Marshall was treated for a laceration.

Everett Vaugh, a police officer for the village of Rockton, stopped the Patton car at approximately 1:15 A.M. on April 4, 1967, as it was proceeding in the direction of South Beloit. At 4 A.M. that same morning he found a hat on the side of the road, later identified as that worn by Falconer.

On cross-examination the officer stated that when he spoke to Mr. Patton, his stories varied a little bit as to how he met the subjects he took to Rockford.

William Redieski testified that the day before Mr. Marshall's funeral he found a wallet (identified as Mr. Marshall's in a ditch off of Witwer Road in South Beloit, Illinois).

Clayton Paddock is employed by the Beloit Sports Center and identified People's Exhibit 5 as the .38-caliber pistol he had sold to Mr. Marshall in 1966.

Richard Garland owns the Beloit Sports Center. On the afternoon of April 3, 1967, a group of 4 or 5 black men came into his store. He could not recognize any of them. One of the men had a .32-caliber pistol and they purchased some .32-caliber cartridges.

Anthony Mannira is the manager of Beacon Liquor Store at 1210 South Main Street in Rockford, Illinois. On April 4, 1967, at about 1 A.M. the defendant and another man came into his establishment. One of the two had a pistol sticking out of his hip pocket. They called a cab, bought a half-pint of whiskey and some peanuts and then left.

Michael Bradbury was a cab driver on April 4, 1967. Around 1 A.M. on that date he picked up two men in the 10, 11 or 1200 block of South Main Street and took them to the Inn-Towne Motel. Bradbury testified that the names of the individuals were Doss and Falconer.

Kandee Haigwood was manager of the Inn-Towne Motel in Rockford on April 4, 1967. At approximately 1:30 A.M. on that date two men registered under the names of Leon Bell and Frank Randall and were given Room 11. One of the men was the defendant. They returned to the office at about 2 A.M. The defendant had a gun sticking out of his right front pants pocket. After some conversation they called a cab and then left. She testified that they returned to their room at about 4 A.M., and sometime later she heard something like a shot or a backfire. She identified a photograph which depicted a hole in the wall of the bathroom in Room 11.

Lee Jack was a cab driver for Yellow Cab on April 4, 1967. At about 1:30 A.M. on that date he picked up two men at the Inn-Towne Motel in front of Room 11. One of the men was Ronald Doss.

Jack testified that they drove around looking for a place to eat. Doss and Falconer accompanied Jack while he drove another cab driver to Pecatonica. When they returned, Jack checked his cab, and picked up his private car. They purchased a meal for Jack, bought him $3 worth of gas and asked to be driven to Chicago. Jack agreed to take them to Chicago the following morning in his car.

Winnebago County Sheriff Deputies Eugene Ebens and Frank England testified that on April 4, 1967, they entered Room 11 of the Inn-Towne Motel at about 7 A.M. and arrested Doss and Falconer. They were accompanied by Officers Renfro, Wenstrom and Ritter. A black jacket in the room contained $300 and .38-caliber revolver. (This revolver was identified as belonging to Mr. Marshall.) From a shirt identified as belonging to the defendant, $400 was removed. In the pocket of a pair of pants, identified as belonging to the defendant, two .32-caliber bullets were removed. A slug was removed from the bathroom wall.

On cross-examination Deputy England testified that he removed a wallet and the .32-caliber bullets from the same pair of pants. An evidence tag indicated that the wallet was found in Ophem Falconer's trousers. On redirect, England testified that he removed the cartridges from a pair of gold pants that the defendant, Doss, put on.

Gary McAlvey is a crime laboratory analyst employed by the Illinois Department of Identification. He testified that the slug removed from the bathroom wall of Room 11 of the Inn-Towne Motel was fired from Mr. Marshall's .38-caliber pistol. Two bullets, Exhibits 21 and 22, were identified by McAlvey as being spent .32-caliber bullets. Mr. Marshall's shirt (Exhibit 20) contained powder burns. In McAlvey's opinion, a .32-caliber weapon would have been fired at a distance of no more than 3 inches to have left such burns.

Dr. Lafler performed the autopsy upon the body of Linford Marshall on April 4, 1967. The cause of death of the victim was due to massive bilateral hemothorax due to a gunshot wound through the aortic artery. People's Exhibit 21, a bullet, was removed from Mr. Marshall's right shoulder area. People's Exhibit 22, a bullet, was removed from Mr. Marshall's right supraclavicular area.

### For the Defense

Donald Williams, a Winnebago County deputy sheriff testified that at the lineup held on April 4, 1967, at approximately 10:30 A.M., Mrs. Marshall identified Ophem Falconer, but stated that she did not get a good look at the other one.

On cross-examination Williams stated that at the lineup both women were still emotionally disturbed from the experience. Williams testified that when Mrs. Marshall said she did not get a good look at the other

one, that meant to him that she did not get a good look at him at the time of the offense. Miss Donath picked out both Doss and Falconer at the lineup.

Robert Keith, a police officer for the city of South Beloit, testified that he questioned Richard Garland, the owner of a sporting goods store, on April 7, 1967. At that time Garland indicated that four black males entered his store on April 3, 1967. When he was shown a picture of the lineup he identified only Ophem Falconer.

Gerald Hanson a police officer for the city of South Beloit testified that Miss Donath gave the following description of the person who was in the store with Falconer: 6 feet tall, thin build, weight 130-140 pounds.

Clayton Wenstrom, a Winnebago County deputy sheriff testified that on April 4, 1967, he spoke to Kandee Haigwood at the Inn-Towne Motel. She told the officer that two colored men had registered at the motel. One of them returned later and called a cab. She stated to him that one of the men had a gun sticking out of his pocket. She told the officer that the man who had the gun was wearing orange or wine colored pants.

John Benyon was the public defender of Winnebago County in April of 1967. In his investigation of the Doss case he spoke with Mary Patton. During their conversation she told him that Doss sat in the front seat during the trip from South Beloit to Rockford.

Gary Polakowski, an official court reporter, testified that he took testimony in a case involving Ronald Doss in July of 1967 and on April 11, 1967:

"(1) Kandee Haigwood, in July of 1967, testified that she could identify the person who registered at the motel, but that she could not identify the person she had talked to later.

(2) John Edward Patton testified in July of 1967 that on April 3, 1967 Ophem Falconer was wearing his (Patton's) hat. He stated that he believed that the hat was tossed out of the car window as they drove to Rockford. Falconer had the hat on when he got into the car, it was tossed out of the window and later recovered at the side of the road.

On that same date Patton testified that everyone shot the shotgun in target practice except Cartwright. He said there were no other shots or any other target practicing.

Patton also testified that the first thing they (Doss and Falconer) asked him to do was to run them over to Linda DuPree's house. When they first came to the house they did not ask Patton to take them to Rockford. They wanted him to take them to Money's house. They did say something about wanting to go to Rockford.

(3) Jean Marshall in July of 1967 testified that she recalled that the person who shot her husband was dressed in dark clothes, had a turban on his head and had a hat over it. She stated that she did not observe how the other man was dressed. She said she did not observe his clothing, however, she did see him and he did not have a hat on.

Mrs. Marshall also testified that when the first shot was fired the other man was in the rear of the store. As she was struggling with the man who did the shooting she got a glimpse of him standing at the counter."

Money Tucker testified that on April 3, 1967, at about 8:30 or 9 P.M. she saw Ronald Doss at her house. When Doss arrived Money Tucker's sister, Linda Johnson, James Curtis, Little Willie and Falconer were there. She stated that Doss remained in her presence from the time he arrived until he left at about 12:15 A.M.

Around 10:30 or 11 P.M. they all went to the liquor store, at that time Money Tucker was driving James Curtis' car. On the way back home from the liquor store they stopped at Marshall's store and Falconer left the car and then returned. They all then returned to Money Tucker's house. She stated that after they returned home Falconer left. Doss left at about 12:15 and then came back about 5 minutes later with Falconer. After that, they both left.

On cross-examination Money Tucker testified that her maiden name was DuPree. She stated that this was the first time she had ever told this story and the first one she told it to was Mr. Smith, Doss' attorney. She said that she was aware of the fact that Doss was in court 5 years previous, that he was charged with murder, but she did not testify at that time, although she was in court. She stated that she recalled the event because she had a good memory.

Ronald Doss testified that prior to April 3, 1967, he had been living with his godmother in South Beloit for 3½ weeks. He had known Ophem Falconer for a week and a half.

On April 3, 1967, he got up about 7 A.M. and went to Johnny Patton's house. Falconer was there. They all left together and went looking for a job. That afternoon he went to Patton's house. Present there were Falconer, Speedy Cartwright, Bobby Mayfield, Mary Moore, Patton and Patton's wife. Cartwright wanted to get a check cashed, and Mayfield wanted to buy some shotgun shells.

They all left and went to a sporting goods store. Ross said he did not go in the store but remained in the car with Mary Moore and Patton's wife. Later they went to a dump and shot a shotgun. Doss said there were no other weapons fired at the dump. While at the Patton house Doss

said he engaged in no conversation and heard no conversation about the possibility of a robbery.

Doss went home, changed clothes and ate supper. He left home about 8 P.M. and went to Money DuPree's home. At the DuPree residence were Falconer, Money's sister Linda, Little Willie and James Curtis. Doss said that Falconer left the house about 11 P.M. while he remained there playing cards. Sometime after midnight Doss left Money DuPree's residence and met Falconer. Falconer told him that he wanted a ride to Rockford. At Falconer's request Doss went to Johnny Patton's home and asked Patton to take Falconer to Rockford. Falconer said he wanted to go to Rockford to pick up some girls.

Patton agreed to take them to Rockford for $10. Doss testified that Patton drove the car. Mrs. Patton sat in the middle of the front seat, Falconer sat in the rear seat and he (Doss) was sitting in the right front passenger seat.

Before going to Rockford, Falconer stopped at Money DuPree's house and then at the house where Falconer lived. Doss testified that after they left Falconer's house he was half asleep and the next thing he recalled was waking up in front of a liquor store in Rockford.

Doss testified that he had $1,100 on his person that night. He claimed he brought $400 from Chicago and accumulated the rest by gambling and through his job.

Doss stated that on April 3, 1967, shortly before midnight, he did not go into the Marshall Grocery Store, that he was not present in the grocery store when Mr. Marshall was shot, and that he did not participate in a robbing or shooting in the store.

On cross-examination the defendant said he knew nothing about a pistol that Mr. Mannira said he saw sticking out of his pockets. He said he saw no pistol. Doss said he did not have a pistol, although he saw a pistol sticking out of Falconer's pocket about 4 A.M. while they were in their motel room in Rockford.

Falconer fired a .38-caliber pistol in the motel at approximately 4 A.M. Doss testified that Falconer told him the the gun accidentally went off while he was looking at it. Doss denied purchasing any .32-caliber ammunition on April 3, 1967, and denied having .32-caliber ammunition in the pocket of his pants when he was arrested.

Doss testified that the first time he had seen a .32-caliber pistol (marked as People's Exhibit 25) was at the motel in Rockford when Falconer examined it at about 4 A.M., pretty close to the time when the shot was fired from the .38-caliber pistol. Doss denied seeing the pistol earlier that day and denied seeing any pistol at the dump.

When Falconer examined the .32-caliber pistol he said it was broken.

Falconer asked Doss to throw it away. Doss went outside, dug up a hole with the heel of his shoe and covered up the gun. He said the reason he didn't throw it into the garbage was because there were no garbage cans around.

The first issue presented by defendant requires a chronology of events leading to the confrontation on cross-examination of defendant.

In *United States ex rel. Doss v. Bensinger* (7th Cir. 1972), 463 F.2d 576, the court of appeals held that there had been a *Miranda* violation and accordingly it was error to permit the State to prove that defendant led the police to the buried weapon, to introduce the weapon into evidence and to demonstrate that this was the murder weapon. The case went back to Winnebago County for retrial.

In the instant case defendant moved to suppress (1) the weapon and any evidence obtained as a result of the discovery of the weapon, and (2) testimony regarding the confrontation between Doss and Falconer when Falconer requested Doss to show the police officers the location of the weapon. The above case was cited and the trial court allowed the motion.

Defendant testified in his own behalf at the trial. His testimony covered his activities during the entire day of April 3 and the early morning hours of April 4, 1967. He denied that there was any gun except a shot gun used at the dump. He denied that there was any conversation at Patton's house about committing a robbery of the Marshall store and denied having been in the store at any time during the robbery and murder.

On cross-examination and over objection defendant was questioned about the weapon and the acts of defendant in revealing where he had hidden it.

Defendant's argument is three-pronged. He argues that the court committed error when it allowed the State to cross-examine beyond the scope of defendant's direct examination; that the court was in error in ruling that the cross-examination of defendant fell within the exception to the exclusionary rule of *Miranda* created by the decision in *Harris v. New York*, 401 U.S. 222, 28 L.Ed. 2d 1, 91 S.Ct. 643, and that a hearing should have been held to determine whether he voluntarily consented to show the location of the murder weapon.

■■ When an accused elects to become a witness, he takes the hazard of the situation and subjects himself to cross-examination upon all questions pertinent to his direct examination. (*Spies v. People*, 122 Ill. 1.) When an accused testifies generally as to what happened in a specified period or his movements on a specified day, he cannot refuse

to answer as to all that occurred within the period of time covered by his testimony. (*People v. Deal*, 361 Ill. 225; *People v. Miller*, 342 Ill. 244, 252.) The cross-examination here was not beyond the scope of the direct examination. Furthermore, the latitude allowed in cross-examination is a question of discretion for the trial court. *People v. Gasior*, 359 Ill. 517, 521.

In *Harris v. New York* (1971) 401 U.S. 222, 28 L.Ed. 2d 1, 91 S.Ct. 643, the Court held that a defendant might be impeached at trial by introduction of his prior statements rendered otherwise inadmissible under *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602. The court said, "Every Criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [Citations.] Having voluntarily taken the stand, petitioner was under obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that conflict could not be laid before the jury by way of cross-examination and impeachment. The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." 401 U.S. 222, 225-226, 28 L.Ed.2d 1, 4-5.

Our supreme court in *People v. Sturgis*, 58 Ill.2d 211, 216, 317 N.E.2d 545, recently held that " * * * the testimony of a defendant or documents voluntarily attested to by him in conjunction with his motion to suppress evidence may not be introduced by the State directly in its case in chief but may be used for purposes of impeachment should the defendant choose to testify at trial." In that case the court discussed *Harris* and to the extent that the holding conflicts with *People v. Luna*, 37 Ill.2d 299, overruled *Luna*.

The long-standing rule in Illinois was that a confession not shown to be voluntary or otherwise competent could not be used for the purpose of impeaching a defendant who testified in his own behalf. *People v. Luna; People v. Pelkola*, 19 Ill.2d 156; *People v. Hiller*, 2 Ill.2d 323; *People v. Sweeney*, 304 Ill. 502; Annot., 89 A.L.R.2d 478.

■■ We believe that the holding of *Harris* is that a confession otherwise inadmissible for defects of procedural due process is not necessarily inadmissible for impeaching the defendant as a witness. Only where there is reason to doubt the reliability of the evidence, as in the case of the

traditional involuntary confession, is the evidence inadmissible for all purposes. Here the evidence is not testimonial, and the suggestion of unreliability is thus removed from consideration.

In the instant case, when before the circuit court of appeals, the habeas corpus petition alleged that the State trial record demonstrated a *Miranda* violation, and relief should be granted for that reason. The court' decided the matter on that basis, thus rendering the admissions inadmissible, not because they were involuntary, but because they were obtained under circumstances which infringed upon the constitutional right of due process in their procurement to-wit, the procedural safeguards required by *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602. The constitutional standards 'for custodial interrogation imposed by *Miranda* have a separate constitutional status apart from considerations of voluntariness.

Of course, if the admissions were coerced they would not be admissible even for impeachment purposes. (*Harris v. New York.*) Which brings up the third prong of defendant's argument.

■■ It is clear that a defendant has a constitutional right to object to the use of a confession and to have a hearing and determination on the issue of voluntariness. (*Jackson v. Denno*, 378 U.S. 368, 12 L.Ed.2d 908, 84 S.Ct. 1774.) But the defendant must contest the voluntariness or no hearing is required. (*People v. Chupich*, 53 Ill.2d 572.) Not only did defendant not request a ruling on voluntariness prior to or during this trial, he failed to raise the issue in his post-trial motion and did not raise the issue at any time in the earlier proceedings in which he was involved. (See *People v. Doss*, 44 Ill.2d 541, 545.) By failing to request a hearing. on the issue of voluntariness the matter was waived and is not open to review. *People v. Hicks*, 44 Ill.2d 550, 553.

■■ Defendant next contends that the trial court committed reversible error in not instructing the jury on its own motion that the suppressed weapon could only be considered by them for impeachment purposes. At the conference on instructions defendant did not prepare, tender, or suggest that he desired such an instruction. The law is well settled that the trial court is under no duty to give instructions not requested by counsel (*People v. Springs*, 51 Ill.2d 418, 425), with the exception of certain fundamental instructions which must be given in all cases. Examples are "Presumption of Innocence and Reasonable Doubt" (*People v. French*, 5 Ill.App.3d 908), and "definition" and "elements of the crime" (*People v. Davis*, 74 Ill.App.2d 450, 454; *People v. Castro*, 1 Ill.App.3d 537).

■■ Supreme Court Rule 615 provides that plain errors or defects affecting substantial rights may be noticed although they were not brought

to the attention of the trial court. The exercise of this authority is seen as discretionary (*People v. Fleming*, 54 Ill.App.2d 457) depending upon the closeness of the case, the conduct of the trial judge, the extent to which the error may have contributed to the verdict, and the magnitude of the errors alleged. (*People v. Lagardo*, 82 Ill.App.2d 119; 15 I.L.P. *Criminal Law* §§ 864-65-66 (1968)), especially where their nature is such as to deprive an accused of his constitutional rights (*People v. Pickett*, 54 Ill.2d 280, 282; *People v. Weinstein*, 35 Ill.2d 467, 471). Supreme Court Rule 451(c) (Ill. Rev. Stat. 1973, ch. 110A, par. 451(c)) also provides that in criminal cases substantial defects in instructions are not waived by failure to make timely objections thereto if the interests of justice require. (14A I.L.P. *Criminal Law* § 652 (1968); *People v. Wright* 24 Ill.App.3d 536, 321 N.E.2d 52. In the instant case we do not not consider that the evidence is closely balanced. The defendant was indeed thoroughly impeached, as was his alibi, and the jury could not have returned any other verdict.

Defendant has cited cases where a nonparty witness is impeached by the use of prior inconsistent statements (incriminating a defendant) but made outside the presence of the defendant. Those cases stated that a limiting instruction should be given upon request. (*People v. Tate*, 30 Ill.2d 400, 403; *People v. Newman*, 30 Ill.2d 419, 424.) The fact that a limiting instruction was not given in those cases was not by itself prejudicial error, but rather its absence simply aggravated the situation. (See *People v. Jennings*, 11 Ill.App.3d 132, 139.) The policy involved is the protection of an accused against use by a jury of hearsay contained in the previous statement. For recent example see *People v. Bailey*, 60 Ill. 2d 37, which held this type of testimony incompetent even for impeachment.

Impeachment of a party witness is quite a different matter since no hearsay is involved. "Ordinarily, the court is not required, in the absence of request, to give an instruction limiting the purpose for which particular evidence may be considered, as, for example, limiting the purpose for which impeaching evidence may be given * * *." 23A C.J.S. *Criminal Law* § 1325(5), at 843-44 (1961); *People v. Durham*, 66 Ill.App.2d 163, 168.

■■ As was stated in *People v. Gratton*, 28 Ill.2d 450, 455: "* * * countless decisions place the burden of submitting limiting instructions upon the party who desires the advantage of the limitation, and that burden was not met by the defendant here." There was no reversible error in the failure of the court on its own motion to give such an instruction to the jury in absence of a request by defendant.

Defendant further argues that by giving IPI Criminal No. 1.02 (Jury

is sole judge of credibility of witnesses) and IPI Criminal No. 3.06 (Admission) the court created a misimpression in the minds of the jury to the effect that the jury would consider all the testimony of defendant in a substantive manner. The record shows that IPI Criminal No. 3.06 was given over defense objection because Mrs. Patton had testified that defendant had stated he had hit one of the women over the head. There was never any effort to link the impeachment evidence as an admission of guilt.

Defendant contends that he was not proved guilty beyond a reasonable doubt. The identification testimony of a single witness is sufficient to convict if the identification is positive and the witness is credible. (*People v. Clarke*, 50 Ill.2d 104.) This is true although the testimony of that witness is contradicted by defendant, or there are alibi witnesses testifying for him. (*People v. Solomon*, 24 Ill.2d 586.) Contradiction of testimony affects credibility, and when this occurs, the degree of credibility and weight to be given testimony are matters for determination by the trier of the facts. *People v. Novotny*, 41 Ill.2d 401.

■■ The two eyewitnesses to the crime, Jean Marshall and Gloria Donath, positively identified the defendant. They asserted their positiveness and remained unshaken on cross-examination. They viewed defendant without obstructions and under very good lighting conditions. The test of a positive in-court identification is not whether the witness gives a full description of the features and clothing of the identified person; it is whether the witness was close enough for a sufficient length of time under conditions adequate for observation and thus had the opportunity to see, observe and later to be able to make the identification. *People v. Canale*, 52 Ill.2d 107.

■■ Minor omissions and discrepancies in a description do not necessarily affect the validity of an identification although they may affect the weight to be given to the evidence. (*People v. Calhoun*, 132 Ill.App. 2d 665; *People v. McVet*, 7 Ill.App.3d 381.) There is no question that Mrs. Marshall had an adequate opportunity to view the defendant under good lighting conditions for a number of minutes. Her identification was clear and certain. Precise accuracy in describing the accused is not necessary if the identification is positive. (*People v. Neeley*, 18 Ill.App.3d 287.) Defendant's cited cases are all distinguishable on their facts and have no application here.

Apart from this testimony the record indicates that defendant was with Falconer during most of April 3, 1967. John Patton overheard conversation between Falconer and defendant planning a robbery and was asked to drive the getaway car. Defendant purchased .32-caliber shells. (Decedent was killed by a .32-caliber slug.) Minutes after the murder,

defendant and Falconer knocked on Patton's door and looked for a ride to Chicago. Mrs. Patton heard defendant say he struck a lady. A gun was seen on defendant. When arrested, the defendant and Falconer had a total of $700 between them and two .32-caliber bullets were removed from defendant's pocket.

The alibi testimony of Money Lee Tucker is hardly credible. Although she was aware of the case and was present in the courtroom during the first trial, she never told the story to anyone until 1 week prior to the instant trial.

Our review of the testimony leads us to the conclusion that the guilt of defendant was firmly grounded on sufficient evidence and that defendant's guilt was proven beyond a reasonable doubt.

Defendant last contends that his sentence should be reduced because:

    a. He had only one prior conviction as an adult (robbery).

    b. Falconer did the shooting.

    c. This court reduced sentence in *People v. Drumheller*, 15 Ill. App.3d 418.

The record in fact shows that defendant was sentenced in 1963 to the penitentiary for robbery and also for *armed robbery*. It also shows that in 1966 he served 6 months for petty theft. In *People v. Drumheller*, the defendant had no prior record.

■■ The law is well settled that where the punishment imposed is within the limits prescribed by the legislature, a reviewing court should not disturb the penalty unless it clearly appears that the penalty constitutes a great departure from the spirit or purpose of the law. (*People v. Hampton*, 44 Ill.2d 41.) In *People v. Burbank*, 53 Ill.2d 261, the owner of a store was shot and killed by Burbank's partner during the commission of an armed robbery. The court held a sentence of 100 to 150 not to be excessive. In the instant case we cannot say that the sentence of the trial court was improper.

The judgment of the Circuit Court of Winnebago County is affirmed.

Judgment affirmed.

RECHENMACHER, P. J., and T. MORAN, J., concur.