**UNITED STATES of America ex rel. Ronald DOSS, Petitioner-Appellant,**

v.

**Lou V. BREWER, Warden, Respondent-Appellee.**

No. 80–2593.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1981.

Decided March 25, 1982.

Certiorari Denied Oct. 4, 1982. See 103 S.Ct. 101.

---

Lawrence Bapst, Springfield, Ill., for petitioner-appellant.

Thomas E. Holum, Asst. Ill. Atty. Gen., Chicago, Ill., for respondent-appellee.

Before PELL and CUDAHY, Circuit Judges, and GRANT,* Senior District Judge.

PELL, Circuit Judge.

This appeal arises from the district court's order of September 15, 1980, denying the petitioner-appellant Ronald Doss' petition for a writ of habeas corpus. The issues which we consider on this appeal concern the scope of cross-examination of Doss at his second trial in state court and whether testimony elicited during that

* Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by desig-     nation.

cross-examination was properly admitted at the trial although it had previously been suppressed by the trial judge and did not directly contradict Doss' testimony on direct examination.

### I.

Doss was convicted of murder in an Illinois state court in 1967. The homicide occurred on April 3, 1967. The weapon involved was a .32 caliber pistol. That conviction was affirmed by the Illinois Supreme Court, *People v. Doss*, 44 Ill.2d 541, 256 N.E.2d 753 (1970). This court vacated that conviction on Doss' first petition for a writ of habeas corpus. This court found that evidence relating to the petitioner's concealment of the gun used in the murder had been improperly admitted as part of the prosecution's case-in-chief because it had been obtained in violation of Doss' rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *United States ex rel. Doss v. Bensinger*, 463 F.2d 576 (7th Cir. 1972), *cert. denied*, 409 U.S. 932, 93 S.Ct. 239, 34 L.Ed.2d 186. There is no indication in this court's opinion that any other police action, particularly that occurring at the time of arrest, violated Doss' constitutional rights, but the focus was entirely on the fact that because of the *Miranda* violation, the state was erroneously permitted to prove that Doss led the police to the buried weapon, to introduce the weapon into evidence, and to demonstrate that this was the murder weapon. *Id.* at 579.[1]

Doss was retried, and again convicted in 1973. That conviction was affirmed by the Illinois Appellate Court, *People v. Doss*, 26 Ill.App.3d 1, 324 N.E.2d 210 (1975), and leave to appeal to the Illinois Supreme Court was denied. Thereafter Doss filed the present petition for a writ of habeas corpus in the district court.

In his petition, Doss raised three issues concerning the prosecution's use of the gun evidence at his second trial. Those issues were: (1) whether petitioner was coerced into admitting he had hidden the gun; (2) whether, assuming Doss' statements were made voluntarily, the prosecution properly impeached petitioner with the statements and the gun; and (3) whether Doss was denied due process because the jury was permitted to consider the gun as substantive evidence. The district court held that habeas relief was not available on the first and third grounds of the petition because the petitioner had failed to raise those claims in the state courts.[2] The court ruled, however, that it was constitutional error for the trial court to have allowed the gun into evidence because that evidence did not contradict some aspect of the accused's direct testimony and was too tenuously related to it to be considered impeachment. Despite that ruling the court found the error harmless in light of the overwhelming evidence of Doss' guilt, and denied the writ.[3]

---

1. While the gun was admitted into evidence on the second trial, there was no ballistics evidence offered to identify the gun as the murder weapon.

2. From our examination of the record, we are of the opinion that the district court correctly decided these issues and we do not discern a need, therefore, for further discussion.

3. The district court's discussion in its Memorandum Opinion, which we regard as substantially supported by the record in this case, leaves little doubt of Doss' guilt.

   The Court's thorough reading of the trial transcript leaves it with the conclusion that the untainted evidence of petitioner's guilt was extremely overwhelming and that improper cross-examination of petitioner was

harmless error. To summarize, both eyewitnesses to the crime, Jean Marshall, Lindford Marshall's wife, and Gloria Donath, positively identified the petitioner. Both Mrs. Marshall and Ms. Donath were able to view petitioner at a close distance and under good lighting conditions. John Patton, an acquaintance of petitioner and Falconer, co-defendant, at the time of the crime, testified that he heard petitioner and Falconer planning the robbery of the Marshalls during the afternoon before the crime and that they had asked Patton if he wanted to participate. Patton further testified that when he saw petitioner and Falconer shortly after the time the crime was committed, they admitted robbing the Marshalls and shooting Mr. Marshall. (footnote 3 cont'd on p. 1006)

While the facts of the case, and a summary of the testimony of the witnesses at the second trial are set forth in the Opinion of the Illinois Appellate Court, *People v. Doss, supra,* a sufficient understanding of the disposition of the crucial issues in this case requires some specific references in this opinion to the testimony, particularly that of Doss.

At the outset we note that after the granting of the writ of habeas corpus by this court when the case went back for a second trial, Doss filed a motion to suppress the pistol. The state trial court at the conclusion of a pre-trial hearing held:

I am going to grant the motion to suppress the .32 caliber revolver previously admitted as the murder weapon and any evidence that was obtained as a result of the discovery of said weapon.

During the pre-trial hearing, the prosecutor noted that the suppression of the revolver was based on the violation of *Miranda* rights. He argued that the *Miranda* decision had no application to rebuttal testimony to impeach a defendant who might take the stand. The prosecutor relied on *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and stated that he wanted the court to be aware of the prosecution's intention if the defendant should testify which was that, if the gun evidence should become relevant, the state would seek to introduce the evidence in rebuttal. Our inquiry, of course, is triggered by the fact that Doss did take the witness stand in his own defense.

We first look at the testimony of other witnesses. Richard Garland, the owner of the Beloit Sports Center, testified that on the afternoon of April 3, 1967 (the date of the murder which occurred shortly before midnight), a group of four or five men came into his store. He could not recognize any of them. One of the men had a .32 caliber pistol and the men purchased some .32 caliber cartridges.

The only significant testimony presented in petitioner's defense was the alibi testimony of Money Lee Tucker. However, as the Illinois Appellate court pointed out, that testimony is entitled to little credibility in view of

John Patton was an acquaintance of both Doss and Falconer. He first saw them on April 3, around 3:30 p. m., at his home. That afternoon they all went to a gun store in South Beloit. One of the men purchased shotgun shells and Patton believed that Doss purchased .32 caliber shells. Later in the afternoon they all went to a dump in South Beloit and did some target shooting. They were using two guns, a shotgun and either a .22 or .32 caliber pistol.

Anthony Mannira is the manager of the Beacon Liquor Store at 1210 South Main Street in Rockford, Illinois. He testified that on April 4 at about 1:00 a. m., Doss and another man came into his store. One of the two had a pistol sticking out of his hip pocket. The men called a cab, bought a half pint of whiskey and some peanuts and then left.

Michael Bradbury, a cabdriver, testified that around 1:00 a. m. he picked up two men in the area of 1000–1200 South Main Street in Rockford and took them to the Inn-Towne Motel; these men were Doss and Falconer.

Kandee Haigwood, manager of the Inn-Towne Motel, said that at approximately 1:30 a. m. two men under the names of Leon Bell and Frank Randall were given Room 11. One of the men was Doss. They returned to the office about 2:00 a. m. Doss had a gun sticking out of the right front pants pocket. After some conversation, they called a cab and left. She further testified they returned to their room at about 4:00 a. m. Later she heard a noise like a shot or a backfire.

Lee Jack, a cabdriver, at about 1:30 a. m. on April 4, 1967, picked up two men at the Inn-Towne Motel in Rockford in front of Room 11. One of the men was Doss. Jack agreed to drive the men to Chicago the following morning in his personal car.

the fact that Ms. Tucker, although present at the first trial, unexplainedly never revealed the substance of her alibi testimony to anyone until one week before the second trial. *People v. Doss*, 26 Ill.App.3d at 17, 324 N.E.2d at 221.

Two sheriff's deputies, Ebens and England, testified that on April 4 they entered Room 11 of the Inn-Towne Motel at about 7:00 a. m. and arrested Doss and Falconer. In addition to several hundred dollars of money, they found a .38 revolver in the room. This revolver was subsequently identified as belonging to the murder victim. In the pocket of a pair of trousers, identified as belonging to Doss, two .32 caliber bullets were found.

Dr. Lafler performed an autopsy on the body of the murder victim and removed two bullets from the body. These bullets were identified by Gary McAlvey, a crime laboratory analyzer employed by the Illinois Department of Identification, as being .32 caliber bullets. The victim's shirt contained powder burns. In McAlvey's opinion, a .32 caliber weapon would have to have been fired at a distance of no more than three inches to have left those burns.

The prosecution did not, in the opening statement of its case, refer to the evidence which this court in the previous visit of the litigation here had held was improperly admitted.

Shortly after Doss took the witness stand, his attention was directed to the area where Doss' godmother lived in South Beloit and a plat of the area was shown to him including the location of the grocery store where the murder occurred. Doss also showed the location of the Patton residence. Counsel then took Doss through the entire day of April 3, step by step, beginning with Doss getting up at about 7:00 a. m. that morning. Doss looked for work in Rockford and the South Beloit area—two or three different places—without success; he thought this took most of the day. After he returned to South Beloit, he went to the Patton residence. He left there with two women and several men, including Falconer, went to another house, and went to a sporting goods store. He did not go near the store although the other four men went into the sporting goods store. He did not actually see them enter but they did "come out with some shells." He at no time entered the store although he had started toward it at the request of one of the women to see why they were taking so long. They all then got back into Patton's car, proceeded to Patton's house and from there to the dump. Someone had a shotgun and it was fired but there was no other gun fired or shot at the dump at that time. Afterwards, they all returned to the Patton house but Doss did not hear anybody discuss the possibility of holding up a place or robbing a place. He knew there could have been some discussion but he didn't hear it nor participate in it.

Subsequently, he went back to his godmother's house, less than a block away, changed clothing, ate supper and stayed there until about 8:00 p. m.; he then went to Money Lee's house; Falconer came to the house later on. They sat around the house, played cards and talked, and he thought they had something to drink there, too. Falconer left the house around 11:00 p. m. but Doss did not leave with him. He continued playing cards but left to go home around midnight. In the area he saw Falconer coming towards Patton's house and Falconer said he was trying to get a ride to Rockford. Doss suggested they go by Patton's to get a ride because nobody at Money Lee's had a car. Patton at first declined to drive them to Rockford but when they offered $10.00 he said he would do so. Patton asked Doss why he didn't go along for the ride. Patton's wife also joined them in the automobile. They returned to Money's house although Doss did not get out of the car but Falconer did. He was in there a while, long enough for Patton to start blowing his horn.

They then went to the house where Falconer was staying. When they arrived in front of a liquor store in Rockford, Doss was asleep. He had $1,100 in his possession at that time. No further questions were asked on direct examination as to what Doss did after being placed in front of the Rockford liquor store asleep or as to what he did for the remainder of the time before he retired for the night.

He was asked, before counsel finished his direct examination, whether he was in the Marshall Grocery Store shortly before mid-

night and he replied that he was not present in the store during the evening when the victim was shot and killed and that he did not participate in any robbery or shooting in the store.

On cross-examination a line of questioning was directed at first to some of the specific activities brought out on direct examination. Doss denied that he was with Falconer around midnight when the crime happened. He again denied that he went into the sporting goods store. When asked whether he bought some .32 caliber ammunition he said again he never went into the store. He denied having a conversation at Patton's house about urging Patton to drive a get-away car in an armed robbery. He was asked what his plans were when he went to Rockford, and whether he was going to stay in a motel. The following testimony then developed:

A. I had no plan to stay in a motel. That was Falconer's idea.

Q. You didn't decide to do that until you got over to Rockford, is that your testimony?

A. That was his idea.

Q. Well, when did it first become your idea? When did you first decide that you would stay in a motel in Rockford?

A. Well, we went by the bus station and—wait a minute. I think the cab driver told Falconer the bus station was closed or something, wouldn't be nobody coming in until 1:00 or 2:00 o'clock or something. I don't know exactly what the cab driver told him, but it was something to that effect, and Falconer suggested that, you know, he get a room and then when the girls come in, he would just—I guess he wanted to stay all night, I guess. I don't know.

To this point there had been no objection to the testimony although apparently this was the first reference to the cabdriver or staying in a motel after arrival in Rockford. Doss was then asked whether he had heard the cabdriver say that Doss had made arrangements for him to come and take him to Chicago. Doss denied making any such arrangements.

At this point Doss' counsel objected to the testimony and a colloquy took place in chambers out of the presence of the jury. The defendant was present at this. The basis of the objection was that, if there was any further testimony as to what happened thereafter, it exceeded the scope of direct examination.

Doss' counsel pointed out that Doss had: testified as to the activities that happened on the evening of April 3rd and early morning of April 4th from leaving South Beloit until he arrived in Rockford at the tavern.

Counsel further indicated that the direction the testimony seemed to be taking was to get in the questions regarding the gun that had been held inadmissible by the federal court. The prosecutor argued that defendant had testified that he did not commit a crime and was then seeking to limit the testimony so that the state could not examine him with evidence to show he did commit it. The prosecutor contended that under *Harris v. New York* the prosecution could get into evidence what might be suppressed in the direct case if the ground was for impeachment and that he thought he had a right to do so. The following colloquy then occurred:

THE COURT: So do I. Let's go. I don't think that any witness or defendant can get on the stand and say "I went down to the grocery store and then I went home," and not expect to be examined on any other things he left out or any other places he might have gone. I think limiting the scope as narrow as you want is within my discretion and I think he can ask him questions. When he gets to the gun, that's something else.

MR. SMITH: Are we going to have to come in chambers again at that time? He wouldn't have known to ask the question last time and he wouldn't have known to ask or question the defendant unless he had the gun, and he obtained the gun because of the illegal methods used in obtaining it.

THE COURT: I'll make the decision right now. According to People v. Weeks—

MR. DOYLE: That's the Sheppard case.

THE COURT: Yes, and with the Harris case, I think he can ask him about the gun. Let's go.

Further interrogation then proceeded with testimony regarding the journeying with Jack the cabdriver; that when Doss was arrested there was only $750 in the room according to the police although Doss had testified that he had $1,100. Doss did not recall saying to the Pattons that he hit some woman over the head. (Mrs. Marshall, the wife of the victim, testified that she had a head wound after an encounter with either Doss or Falconer that required eight stitches.)

Doss was then asked about his hearing the testimony of Mannira pointing out that Mannira said that "one of you had a pistol sticking out of his pocket." The witness replied that he didn't know, he "didn't see no pistol." He again repeated his answer. A question was then directed towards the Haigwood testimony, that she saw a pistol at the motel in somebody's pants. The following then occurred:

A. Yes, but she said my pants. I didn't have no pistol.

Q. The question is did anybody have a pistol sticking out of his pants?

A. Yes, he could have had one sticking out of his pants.

Q. The question is did anyone have a pistol sticking out of his pants.

A. I didn't see no pistol sticking out of his pants.

Q. You were with him all night and you didn't see any pistol either in your pants or his pants?

A. Well, I saw—not all night. What time are you asking me?

Q. Can you tell us if there was any time that night you saw a pistol in either your pants or sticking out of Falconer's pants?

A. Yes, I saw a pistol sticking out of his pants.

Q. When?

A. It was early in the morning around—I don't know. About 4:00 o'clock in the morning, I think.

Subsequently, Doss specifically denied that there was ever a pistol sticking out of the pocket of the pants he was wearing which were gold in color. Doss further testified that just before he went to bed around 4:00 a. m., he heard a gun explode in the room; that it was in Falconer's hand. This gun was Exhibit 5, the immediately preceding possessor of which was the late store proprietor. This was a .38 caliber pistol although at the time of the shooting in the motel room this was the first time according to Doss that he had seen the pistol. Doss asked Falconer why he was shooting the pistol in the room; the walls could be thin and a shot could go through the partition and hit somebody on the other side. Falconer said it was an accident.

Doss was then asked if he had purchased any .32 caliber ammunition earlier that day and replied, "No." He indicated that he had heard in court that Marshall had been killed with .32 caliber ammunition, but when asked whether it was a fact when he was arrested there was .32 caliber ammunition in the motel room, he said he didn't know what was in there, "the only thing I know, I had my clothes and my money, that's it." When asked if he had any .32 caliber ammunition in his pocket, he replied, "No." When asked, "did either you or Mr. Falconer see at any time that night a .32 caliber pistol?", Doss replied, "Yes." He then identified Exhibit 25 and said that was the pistol he had seen that night. It was slightly after 4:00 o'clock when he first saw it and had not seen it earlier in the day. He denied seeing a pistol at the dump and said they had nothing but the shotgun. He didn't really talk to Falconer about the .32 caliber pistol but, "I just saw him examine it, that's all." Falconer said it was broke and he asked Doss to take it outside and throw it away, which he did about 4:00 o'clock. He kicked a hole, there being no garbage can around, and buried it—covered the gun. When asked why he had taken the gun out and put some grass and dirt over it he responded:

Falconer was standing up in the bedroom. He examined the gun and said it

was broke and he asked me to take a look at it, and he said something about that he had took some guns in pawn. Anyway, I took a look at it and it appeared to be broke like, you know, he had it broke down and he couldn't pull the trigger. I tried and the trigger couldn't be pulled. So anyway, he asked me to take it outside and throw it away. So I went outside. I looked for a garbage can and wasn't no garbage can, nothing but the sidewalk. So I didn't just want to throw it on the ground because kids could come by and see it and pick it up. I didn't know if it could be fired ever again, but it had to be disposed of, that's all.

On redirect examination Doss' counsel immediately took up the matter of the .38 caliber revolver. Doss' immediate response was:

Well, at first he told me about one gun and then when I came back—he asked me to throw the other gun away. When I come back I heard a shot as I was at the door. I stepped inside the door and he was standing inside the washroom with a gun in his hand. So I asked him, I said, what happened, man? He said, oh, man, this gun went off. I said, where you keep getting them guns from? He said, I took them in pawn.

Doss next was asked about the .32 caliber pistol and that also, according to Doss, Falconer had gotten in pawn. Other testimony developed the following: Falconer had registered into the room; it wasn't what he wanted to do about the .32 caliber pistol; Falconer had asked him to take it out and throw it away; he didn't say get rid of it, he said "throw it away." Doss then went into some detail about what he did outside and that if he had been trying to hide it he could have thrown it on the roof. That it was easy to see where he had put it. After kicking a hole, he went back into the room.

At this point, it seems, from the testimony, that Doss first heard the shot previously mentioned when he returned to the room. He was not asked to take the .38 caliber gun "and do anything with it or hide it for" Falconer. He had not known until he got

into court that either weapon had been used in a hold-up and shooting and that one gun in fact had belonged to Marshall who had gotten shot.

After some discussion of other matters not material here concerning a hat and traveling in a cab, there were questions and answers about what had occurred during the arrest with particular emphasis by Doss in wanting to know from the police what this was all about. He was taken to the station and interrogated and testified that the police beat him, knocked some teeth out, and bloodied his nose.

The police took him back to the motel on the morning of the 4th and he showed them where the gun was. It had been put there at night and Doss wasn't exactly sure where it was but he took them to the spot and they easily found the gun. He said that the police had said to him they knew he didn't have anything to do with it; they were going to let him go after they got the gun. The testimony then was directed to subsequent activity at the police station including a lineup.

On recross-examination, interrogation by the prosecution for the first time was directed to a trip with the police by Doss to show the police where the gun was. The witness said that this had been about 8:30 or 9:00 in the morning.

There was some effort to question him about the condition of his teeth apparently because he had claimed that the police had knocked out some teeth. The judge, however, did not let this line be pursued on the grounds that if Doss had his teeth fixed in the penitentiary he didn't want that fact to come out in evidence. The court also did not allow pursuit of a line of questioning about a cellmate of Doss'.

In a session in the judge's chambers, Doss personally complained that the prosecution was attempting to put the impression in the jury's mind that he had contacted a witness. The judge pointed out that he would not let this line of questioning be pursued. Doss also complained at that time that his telephone in the jail was monitored and the

court told him that if there was any wire-tapped telephone conversations, it couldn't be introduced. Thereafter various exhibits were introduced into evidence including the .32 caliber pistol.

No instruction limiting use of the gun or the above-mentioned testimony to impeachment was requested by the petitioner, and none was given. The prosecutor made several references in closing argument to the gun and the manner in which Doss had disposed of it. No objection was made to those comments, and their propriety was not questioned on direct appeal.

## II.

■ The question of the scope of the prosecution's cross-examination of Doss is preliminary to and separate from the matter of the cross-examination pertaining to the .32 caliber pistol, particularly as to Doss' showing the police where the gun was which was subsequent to the insufficient *Miranda* warning. We agree with the trial court judge that within some reasonable limitations, when the accused takes the witness stand, he should not be permitted to bind the cross-examiner to an overly narrow time frame. Here the attorney started Doss' testimony with reference to what Doss did from 7:00 a. m. on April 3rd, including looking for jobs in Rockford in the morning, and did not get to any happenings relevant to any issue in the case until he ultimately had Doss as being an innocent bystander in an automobile outside of a gun shop while others went in to buy ammunition. The next crucially relevant period of time was at the dump during which Doss denied that there was a pistol present and particularly that no one had fired a .32 caliber pistol.

The defense counsel then took Doss on virtually a step-by-step basis through his activities during the early evening of April 3rd although there was no apparent relevance in this testimony other than showing everything he did during that evening. Relevance did not develop until later, at least 10:30 or 11:00 at night as the robbery and homicide did not occur until a few minutes before midnight. The recital did not stop with attempting to show that Doss was elsewhere than the Marshall Grocery Store at the time of the murder but continued with a recitation of activities until an hour or so afterwards taking him to the vicinity of a liquor store in Rockford where his counsel left him asleep in a cab as far as direct examination was concerned.

■ We think it was entirely within the discretion of the trial judge to include within the appropriate time frame for cross-examination a reference at least to the crucially relevant happenings at the motel at 4:00 a. m. Other than some short sleep in an automobile, Doss' day, which began at 7:00 a. m. on April 3rd, did not conclude until 4:00 a. m. on April 4th. The initial cross-examination did not exceed this time frame but concluded with Doss' retirement after his long day of activities at the motel about 4:00 a. m. on April 4th. This included, of course, his testimony about taking the .32 caliber pistol outside and putting it under some grass and dirt. The prosecution testimony elicited on direct examination did not get into the next morning's activities involving Doss showing the police where the gun was. It did involve what the police found in the room the next morning when they arrested Doss including the .32 caliber bullets but this merely pertained to testimony that the deputy sheriffs had earlier given at the trial.

In our opinion, therefore, the trial court judge did not abuse his discretion in permitting the scope of cross-examination to be directed to all of Doss' activities during his waking hours from 7:00 a. m., April 3rd to approximately 4:00 a. m. on April 4th. Further, with regard to the matters which developed three hours later when the police found the .32 caliber cartridges in Doss' trousers, we regard this as appropriate matter for cross-examination as this testimony was not in any way derived from the *Miranda* warning situation and was already in evidence through the testimony of the deputy sheriffs.

Our position is fortified in the above respect by the case of *People v. Mannen*, 46

Ill.App.3d 61, 4 Ill.Dec. 627, 360 N.E.2d 563 (1977). In this case the defendant argued that his cross-examination and the state's rebuttal evidence should not have been admitted because the time span in question was between 6:45 p. m. and the time of the robbery at approximately 9:30 or 9:45 p. m. during which time the defendant asserted he had an alibi. In the view of the court, the defendant's presence at a residence between 3:30 and 4:00 p. m. on the day of the robbery was not so remote in time as to constitute a collateral matter or be irrelevant. The court recognized that while cross-examination should be limited to the subject matter covered by direct-examination, it was proper on cross-examination to develop all circumstances within the knowledge of the witness which explained, qualified, discredited, or destroyed his direct testimony although they might be incidents constituting new matters which would aid a cross-examiner's case.

Similarly to the case at bar, in *Mannen* cross-examining the defendant more on an afternoon matter outside of the precise time frame of the direct examination placed in issue his credibility by his direct denial of facts testified to earlier by witnesses for the state. The defendant, according to the Illinois court, put his own credibility in issue by taking the stand and contradicting the state's evidence. The court pointed out that the purpose of cross-examination was to obtain the truth and that trial courts are allowed wide discretion in permissible cross-examination especially as to the defendant's credibility after he has testified and where some degree of relevance is established. *Id.* 360 N.E.2d at 565.

In the case at bar, Doss in his direct examination had denied that he had purchased any ammunition for a .32 caliber gun and denied that there was any pistol used at the dump when the people were engaged in target shooting. This squarely contradicted the state's evidence which had earlier been admitted. The testimony of other prosecution witnesses was also contradicted by Doss as we have noted hereinbefore. There was no constitutional error in permitting the prosecution to test the credibility of Doss in the manner in which it was done here.

We now turn to the matter of the concealment of the gun and Doss' showing the police where he had put it the night before. We will assume, arguendo, that not only was the testimony regarding the police being shown where the gun was left, but also the fact that Doss had taken the gun out and put it under the grass and dirt, were under the interdiction flowing from the *Miranda* violation. Showing the police where the gun was directly flowed from the *Miranda*-prohibited knowledge imparted to the police but, arguably, at least the testimony of Doss regarding the hiding of the gun at about 4:00 a. m. bore some taint arising from the *Miranda* violation. The prosecutor, however, did not go into the matter of the police being shown where the gun was. This was brought out on re-direct examination by Doss' counsel. Doss was given the opportunity to present on this redirect examination his version that the police did not think he was involved with the crime and they were going to let him go after he "went and got the gun."

The counsel for Doss may well have thought that since Doss had testified that he had taken the gun out and partially concealed it, that because a .32 caliber pistol had been marked as an exhibit and because Doss had stated on re-cross examination that it was one of the pistols Falconer had, that the evidence justified proceeding to show how the gun had been found by Doss' being willing to take the police to it. In any event, this was what defense counsel chose to do and was a matter from which the prosecutor had stayed away. Of course, Doss was also enabled to present his explanation of how the gun got outside and that the police had let Doss think he wasn't involved.

As we previously noted, the district court had ruled that the gun did not contradict Doss' testimony on direct-examination and furthermore that the evidence was too tenuously related to the direct testimony to be considered impeachment. The court found

*Agnello v. United States,* 269 U.S. 20, 35, 46 S.Ct. 4, 7, 70 L.Ed. 145 (1925), controlling.

In *Agnello,* the Supreme Court reversed the defendant's conviction because the prosecution had used illegally seized evidence (narcotics taken from the defendant's home without a search warrant) to impeach the defendant's statement on cross-examination that he had never seen narcotics. The Court pointed out that the defendant was not asked and did not testify on direct examination about the suppressed evidence, and concluded that Agnello "did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search." 269 U.S. at 35, 46 S.Ct. at 17.

The recent case of *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), modified *Agnello* to permit impeachment by suppressed evidence of testimony elicited on cross-examination when such cross-examination "would have been suggested to a reasonably competent cross-examiner," by the direct testimony. 446 U.S. at 626, 100 S.Ct. at 1916.[4]

In *Havens,* a customs officer found cocaine sewn into makeshift pockets in a T-shirt worn by McLeroth, who in turn implicated Havens, whose luggage was then searched without a warrant. A T-shirt with holes corresponding to the pockets on the other T-shirt was found. At the trial, McLeroth, who pleaded guilty, indicated that Havens had supplied him with the patches to make the pockets, and had sewn them shut. On direct examination, Havens acknowledged the prior testimony that the cocaine was "taped or draped around McLeroth's body," but denied in general terms having had anything to do with McLeroth in connection with the cocaine matter. On cross-examination, the Government asked the defendant if he had anything to do with sewing the pockets on McLeroth's T-shirt, and he denied it. The Government asked if he had a T-shirt in his luggage with holes cut in it, and again, Havens denied it. The Government then introduced the T-shirt into evidence. Havens was convicted at trial, but the conviction was reversed by the court of appeals on the basis of *Agnello* and *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (when defendant stated on direct that he had never sold or possessed narcotics introduction of illegally seized heroin was permissible).

In reversing the court of appeals the Supreme Court noted that Havens' general denial that he had engaged in such activity

> could easily be understood as a denial of any connection with McLeroth's T-shirt and as a contradiction of McLeroth's testimony. Quite reasonably, it seems to us, the Government on cross-examination called attention to his answers on direct examination and then asked whether he had anything to do with sewing the cotton swatches on McLeroth's T-shirt. This was cross-examination growing out of Havens' direct testimony; and, as we hold above, the ensuing impeachment did not violate Havens' constitutional rights.

446 U.S. at 628, 100 S.Ct. at 1917.

We find this analysis to be the proper mode for assessing this case, and turn therefore to a determination whether the questions asked Doss on cross-examination were reasonably suggested by the defendant's direct testimony.

Initially, we note that with the exception of the gun matter itself the time frame of the direct examination entitled the prosecution to a wide probing of Doss' activities.

■ As previously noted, another witness had connected Doss to .32 caliber shells and a .32 caliber pistol. Once it was decided that Doss would testify, the dilemma, of course, existed as to what to do about this

---

4. The United States Supreme Court decided *Havens* on May 27, 1980, after both the petitioner and the respondent had submitted their respective motions for summary judgment but before the district court issued its memorandum opinion. On June 4, 1980, the respondent brought *Havens* to the court's attention on a motion to cite additional authority. That motion was granted on June 10, 1980, but the district court did not allude to *Havens* in its memorandum order of September 15, 1980.

testimony. If it was ignored, it would stand unrebutted before the jury. Counsel obviously was attempting to get the denials of this adverse testimony into testimony while phrasing his questions as narrowly as possible. In our opinion, the testimony which followed was sufficiently broad to carry the clear implication that Doss was claiming to have had no connection with a .32 caliber pistol at any time within the time frame of his testimony, just as Havens' general denial of assisting McLeroth implied a denial of any connection with McLeroth's T-shirt. Whether Doss had seen a pistol at any time during the time period involved was reasonably called for by the denials. It was therefore allowable under *Havens* for the prosecutor on the basis of the denials to bring out the fact that Doss indeed had come in contact with a .32 caliber pistol within a few hours following the homicide and, indeed, had taken it outside and partially concealed it.

By then eliciting testimony that Doss had disposed of the gun in a manner which would support an inference that he had seen the gun previously, i.e., during the course of the murder, the prosecutor was within proper bounds, under a *Havens* analysis, in seeking to impeach Doss' testimony on cross-examination that he had not seen a .32 caliber pistol at any time prior to 4:00 a. m. on April 4. As we have previously noted, the testimony that Doss had first seen a gun at 4:00 a. m., was itself appropriately elicited by questions which would have occurred to a reasonably competent cross-examiner on hearing Doss' testimony on direct, and was thus within the scope of the direct examination. While the impeachment value of the gun evidence is perhaps not as substantial as was Havens' fenestrated T-shirt, that goes to the weight of the evidence, not its admissibility under the *Havens* analysis. We therefore hold that admission of the gun evidence for impeachment purposes did not violate Doss' constitutional rights, and that the district court erred in concluding that permitting the prosecution to probe into the petitioner's contact with a .32 caliber pistol was constitutional error.

### III.

In light of our determination that the gun evidence was properly admitted, we need not reach the district court's conclusion that the admission was harmless error notwithstanding that the district court did correctly characterize the evidence as overwhelming. We also therefore need not decide whether the evidence at the second trial was sufficiently dissimilar to that adduced at the first to avoid application of the doctrine of the law of the case. *Cf. Metheany v. United States*, 390 F.2d 559 (9th Cir. 1968), *cert. denied*, 393 U.S. 824, 89 S.Ct. 81, 21 L.Ed.2d 94 (previous opinion of the court of appeals not law of case where defendant convicted on new trial possibly with new evidence). We do note, however, as we have already indicated, that a strong case for harmless error was certainly made out here, where two eyewitnesses to the murder identified the defendant, and there was substantial other evidence linking him to the crime.

In accordance with the foregoing reasons, the judgment of the district court is AFFIRMED.

CUDAHY, Circuit Judge, concurring.

Although I think the denial of the petition may be affirmed on the basis of untainted evidence described by the district court as "extremely overwhelming," I cannot accept the logic whereby the once-suppressed gun evidence has been so conveniently resurrected. With all respect, I must reject the majority's hard-cases-make-bad-law analysis.

The majority reasons that Doss' direct testimony implied that he "was claiming to have had no connection with a .32 caliber pistol at any time within the time frame of his [direct] testimony." *Ante* at 1014. One can certainly quarrel, however, with the majority's contention that the "time frame" of the testimony of Doss on direct examination covered a period which can be construed to extend until about 4:00 a. m. on April 4 (when the gun was buried). From all accounts the direct testimony covered a period from approximately 7:00 a. m. on April 3 until "sometime after 12:00"

(midnight) on that day, when Doss and his companions arrived in Rockford. R. 834; R. 846; Respondent's Brief at 6. The majority manages to extend by several critical hours the carefully limited time frame of Doss' direct testimony by the unconvincing argument that, with the small interruption of a "short sleep" in the cab, Doss' day did not end before 4:00 a. m. on April 4. Apparently, the majority believes that by remaining awake until 4:00 a. m., Doss opened himself up to cross-examination about events which occurred during his waking hours even though the timing of those events was well beyond the period covered on direct examination. I am unwilling, however, to join in an analysis that makes the scope of a defendant's Fifth Amendment privilege depend on when he retired for the night.

What the majority does in part is to enlarge artificially the scope of Doss' direct testimony to include the burying of the gun at 4:00 a. m. and then somehow to read into that direct testimony "the clear implication" that Doss was denying any connection with a .32 caliber pistol during the (now redefined) time frame of his direct testimony. Having done all this, it is easy to conclude that the tainted gun evidence impeached this implicit denial. *If* Doss had testified, either implicitly or explicitly, that he did not see a .32 caliber pistol at 4:00 a. m., there would be a sound basis for impeachment, but that was not his testimony. As the district court observed, "Petitioner at no point during his direct testimony even implicitly denied that he had even seen the murder weapon or that he had buried the gun." Memorandum op. at 7. It is only by expanding the time frame of Doss' direct testimony and then interpreting his testimony as referring to events about which he never purported to testify that the majority is able to locate any direct testimony by Doss that the tainted evidence can be construed to impeach.

I have some difficulty in understanding how this analysis is in any significant way affected by *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) and its approval of the admission of evidence to impeach statements made on cross-examination. The majority suggests that Doss' manner of disposing of the gun impeached "Doss' testimony on cross-examination that he had not seen a .32 caliber pistol at any time prior to 4:00 a. m. on April 4." There are several serious problems with this approach:

1) Doss' testimony on cross (to the extent it involved *denials* of contact with a .32 caliber pistol) did little more than restate the discrete denials (of buying ammunition, doing target shooting, etc.) made on direct,

2) Doss made no general denial on cross of seeing a .32 caliber pistol, just as he had made no such general denial on direct,

3) it requires rank speculation to perceive how the manner of disposal of the gun at 4:00 a. m. in fact impeaches any of the discrete denials of contact with a .32 caliber gun or .32 caliber ammunition contained in prior direct or cross-examination, and

4) in any event a 4:00 a. m. event is beyond the scope of the direct examination.

Thus, I agree with the district court that the gun evidence had no impeachment value. I also believe, as I have indicated, that the cross-examination with respect to the burying of the gun at 4:00 a. m. on April 4 was not "reasonably suggested" by Doss' direct testimony. And *Havens* is not to the contrary. In *Havens*, the defendant on direct examination broadly and categorically disavowed any involvement in McLeroth's taping of drugs to his body. The prosecution's questions on cross-examination focused on this general denial and inquired into the much more specific question of McLeroth's use of cotton swatches to accomplish the smuggling. Quite properly, the Supreme Court held that this cross-examination was "reasonably suggested" by and grew out of defendant's direct testimony. In the instant case on the other hand, the prosecution on cross-examination did not limit itself to the subjects raised on direct examination but instead expanded the scope of the questioning by asking the general question, "Did either you or Mr. Falconer see *at any time that night* a .32

caliber pistol?" R. 894 (emphasis supplied). What the Supreme Court has said about *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), is entirely in point to the prosecution's efforts in the instant case:

> There, the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question, "Did you ever see narcotics before?"

*Walder v. United States*, 347 U.S. 62, 66, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954). Although this is a closer case than *Agnello*, I believe that, as in *Agnello*, the cross-examination here had "too tenuous a connection with any subject opened upon direct examination to permit impeachment by tainted evidence." *Havens*, 446 U.S. at 625, 100 S.Ct. at 1915.

I conclude, however, as did the district court, that the error here, although significant, may be deemed harmless. There was other compelling untainted evidence of Doss' guilt.