THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT BANKS, Defendant-Appellant.

First District (1st Division)   No. 1—88—2647

Opinion filed January 25, 1993.

Randolph N. Stone, Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Kenneth T. McCurry, and John J. Kim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Robert Banks was found guilty of three counts of armed robbery. The trial judge sentenced defendant to 20 years in the Illinois State Penitentiary. The alleged trial errors defendant asserts on appeal are: (1) that the prosecution's systematic exclusion of blacks by peremptory challenges violated his constitutional rights; (2) that his statements to the assistant State's Attorney should have been suppressed because they were taken in violation of his right to counsel and, therefore, were involuntary; (3) that he was

not proven guilty beyond a reasonable doubt; and (4) that his 20-year prison sentence was excessive and should be reduced.

On June 6, 1986, at approximately 1:50 a.m., Diane Barrett and Joyce Branch were walking toward Joyce's home. A friend of theirs, Michael Babuskow, saw them as he was driving by and offered them a ride home. On the way, they stopped for gas at the Shell station on 43rd by the Dan Ryan. Diane and Joyce remained in the car while Michael pumped the gas. According to their testimony, they were then robbed at gunpoint by four men. The robbers stole $13 from Michael, some jewelry from Diane, and eyeliner and glasses from Joyce. According to the victims' testimony, Michael was knocked to the ground and beaten. The victims also testified that, at some point, the gas station attendant announced over the public address system that he had called the police. One of the robbers then threw a garbage can through the back window of Michael's car and all four fled on foot.

Subsequently, the police presented the victims with "photographic arrays" and each identified defendant and his three codefendants, Gene Jones, Frank Williams, and O'Neal Johnson, as the robbers. An arrest warrant was issued for defendant based upon the photographic identification and he was arrested on August 22, 1986. Defendant was placed in a lineup that night and Joyce identified him as one of the robbers. Detective Kwilos informed defendant that he had been identified and read him his *Miranda* warnings. Defendant indicated he understood his rights and he expressly invoked his right to counsel.

Kwilos then informed Assistant State's Attorney Barbaro that defendant was back in lockup and that he desired to speak to an attorney. Barbaro and Kwilos returned to the lockup to have a conversation with defendant. Both Kwilos and Barbaro testified that Barbaro informed defendant that he was not defendant's attorney, that defendant had been identified in the lineup, and that he was probably going to charge defendant with armed robbery that night. Barbaro then went into an interview room across from the lockup to work on some paperwork. Defendant then asked Kwilos if he could speak to Barbaro. According to Kwilos and Barbaro, after Kwilos brought defendant to Barbaro, Barbaro again told him his *Miranda* warnings and explained to him that he was not his attorney. Defendant indicated that he understood his rights. Barbaro stated that defendant then asked several questions; specifically, he asked whether it would help him or hurt him to make a statement. Barbaro testified that he responded by saying that "[n]obody likes a liar [and that] [h]onesty is the best policy." According to Barbaro, defendant thought about it and "hemmed and hawed" but then decided to make a statement. Af-

ter telling Barbaro "what happened," Barbaro transcribed defendant's statement. Defendant refused to sign the statement.

At trial, defendant testified that he was at the Shell station getting gasoline with several friends when he saw Michael Babuskow. He testified that he recognized Michael as one of about eight white men who had shouted racial slurs and attacked defendant and several of defendant's friends three weeks earlier. Defendant testified that Michael had hit him with a stick during the racial incident. Defendant stated that when he saw Michael at the Shell station he became very upset and drove away without his friends. He parked his car around the block from the station and came back "to fight with Michael." He stated that he ran up behind Michael and hit him and they both fell to the ground. He testified that he did not see his friends or the two women in the car. He then got up when he heard sirens, threw the garbage can through the back window of the car, and ran away. He stated he never had a gun. He acknowledged that his friends "might have been taking the women's stuff," but that he did not see the women or his friends.

Ted Griffin supported defendant's testimony that several weeks prior to the alleged robbery he and defendant had been attacked in a white neighborhood by a group of white men shouting racial slurs. Griffin was unable, however, to identify Michael as one of the attackers.

All three of the codefendants, Jones, Williams, and Johnson, pleaded guilty and were sentenced to seven years in the Illinois Department of Corrections. Defendant requested a jury trial. Prior to trial he filed a motion to suppress his statement on the ground that it was taken in violation of *Miranda* because he had expressly requested to speak to an attorney. His motion was denied. Defendant was found guilty and sentenced to 20 years in the Illinois Department of Corrections.

I

Defendant's first contention on appeal is that the State's systematic exclusion of blacks from the jury through the use of peremptory challenges denied him equal protection of the law. The State contends that its explanations for striking the jurors in question properly were determined by the trial court to be race-neutral.

In *Batson v. Kentucky* (1986), 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83, 106 S. Ct. 1712, 1719, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to [peremptorily] challenge potential jurors solely on account of their race." The *Batson*

Court set out an approach for analyzing an objection to the prosecutor's exercise of peremptory challenges. First, defendant must make out a *prima facie* showing of purposeful racial discrimination in the State's exercise of its peremptory challenges. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) If in view of all relevant circumstances defendant sets forth his *prima facie* case, the burden then shifts to the State to articulate a "clear and reasonably specific" race-neutral explanation for each of its questioned peremptory challenges. (*Batson*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1724 n.20; *People v. Harris* (1989), 129 Ill. 2d 123, 184, 544 N.E.2d 357, 384.) A race-neutral explanation is one "based on something other than the race of the juror." (*Hernandez v. New York* (1991), 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406, 111 S. Ct. 1859, 1866.) Although this explanation "need not rise to the level justifying exercise of a challenge for cause," the prosecutor will not rebut a *prima facie* showing by merely guaranteeing to the court that he had no discriminatory motive. *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723-24; *People v. McDonald* (1988), 125 Ill. 2d 182, 198, 530 N.E.2d 1351, 1358.

Finally, the trial court must then determine "if the defendant has established purposeful discrimination." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.) In coming to its conclusion, the trial judge must make " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case.' " (*Harris*, 129 Ill. 2d at 174-75, 544 N.E.2d at 380, quoting *People v. Hall* (1983), 35 Cal. 3d 161, 167, 672 P.2d 854, 858, 197 Cal. Rptr. 71, 75.) The trial court's determination on the issue of discrimination is a finding of fact which in a large part turns on an evaluation of credibility and, therefore, is entitled to great deference. *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21; *Harris*, 129 Ill. 2d at 175, 544 N.E.2d at 380.

The Illinois Supreme Court has often analyzed a trial court's determination on purposeful discrimination in the use of peremptory challenges under a "manifest weight of the evidence" standard. (See *People v. Hope* (1990), 137 Ill. 2d 430, 472, 560 N.E.2d 849, 866; *Harris*, 129 Ill. 2d at 175, 544 N.E.2d at 380; *People v. Mack* (1989), 128 Ill. 2d 231, 238, 538 N.E.2d 1107, 1111; *McDonald*, 125 Ill. 2d at 199, 530 N.E.2d at 1358.) The Illinois Supreme Court apparently also has utilized a "clearly erroneous" standard. (See *People v. Young* (1989), 128 Ill. 2d 1, 21, 538 N.E.2d 453, 457.) Recently, however, in *Hernandez v. New York* (1991), 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412, 111 S. Ct. 1859, 1871, the United States Supreme Court

stated that it would not reverse "[a] state trial court's finding on the issue of discriminatory intent unless convinced that its determination was *clearly erroneous*." (Emphasis added.) Then, in 1991, the Supreme Court granted *certiorari* in the *Hope* case, vacated the Illinois Supreme Court decision and remanded for further consideration in light of *Hernandez*. (*People v. Hope* (1990), 137 Ill. 2d 430, 560 N.E.2d 849, *cert. granted* (1991), 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792, *rehearing denied* (1991), 501 U.S. 1269, 115 L. Ed. 2d 1097, 112 S. Ct. 13, *remanded & modified on rehearing* (1992), 147 Ill. 2d 315, 589 N.E.2d 503.) It appears that on remand, the Illinois Supreme Court reviewed the trial court's conclusion on the issue of purposeful discrimination in jury selection under the clearly erroneous standard. (*People v. Hope* (1992), 147 Ill. 2d 315, 321, 589 N.E.2d 503, 506.) Nonetheless, if the exercise of even one peremptory challenge is determined to have been racially motivated, the defendant's conviction must be reversed and remanded for a new trial. *Harris*, 129 Ill. 2d at 175, 544 N.E.2d at 380; *People v. Baisten* (1990), 203 Ill. App. 3d 64, 77, 560 N.E.2d 1060, 1068.

The first consideration then, in the instant case, is whether defendant made out a *prima facie* showing of racial discrimination. In its brief, the State concedes that the trial court implicitly found a *prima facie* case of purposeful discrimination, but then argues that, based upon the record, defendant cannot properly establish such a case. The issue is irrelevant, however, in light of the *Hernandez* decision. In *Hernandez* (500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866), the Supreme Court stated that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." In the instant case, the prosecutor offered race-neutral explanations for his peremptory challenges and the trial court ruled that they were not racially motivated. Therefore, we turn directly to the question of whether the State has met its burden of providing "clear and reasonably specific" race-neutral explanations.

In the instant case, after the State exercised its sixth straight peremptory challenge against a black individual, the defense objected under *Batson*. The trial judge called counsel into chambers, clearly annoyed that "the State would create this issue." It was noted for the record by both the judge and defense counsel that all of the State's challenges had been used against black individuals. The State immediately withdrew its last challenge. The judge stated that withdrawing

the objection was "a very wise decision" because the juror's qualifications were "impeccable." The State then insisted that all its challenges were based on racially neutral grounds and asserted that "defense in this case has excused Dallas Green, as well as, I believe, other black individuals who have been accepted by the State." The judge expressed his belief that "[b]oth sides have used challenges to try and select a fair and impartial jury." However, so the case would not have to be sent back for a *Batson* hearing, he asked the State to indicate for the record "reasons other than racial" to explain the exercise of its peremptory challenges.

After the prosecutor stated the State's explanations, the trial judge concluded that the State's exercise of its peremptory challenges was "not racial in nature, but just in the State's Attorney trying to achieve a fair and impartial trial." For the record, the defense objected, asserting that the State's reasons were pretextual and separated the State's explanations into two categories. First, defense objected that the reasons the prosecutor asserted for excluding the black veniremembers would also have applied to the white veniremembers the State accepted and, therefore, the only difference between the veniremembers the State accepted and those it did not accept was their color. Second, the defense argued that when the prosecutor could not come up with anything else, she merely asserted those "types of things [that do not] show up in a record" and for which there is nothing for an appellate court to look at such as "somebody's tone of voice or the look in their [*sic*] eye." Finally, defendant impliedly argues by including an appendix to its brief labeled "Trial Court's Views On The *Batson* Case," that the trial judge's finding at the *Batson* hearing is "suspect" due to the court's, to say the least, "critical view" of the *Batson* decision.

The State's first peremptory challenge was exercised against Sapata Wilkes. The prosecutor stated that the fact that Mr. Wilkes was 27 years old, unmarried, and had a two-year-old son indicated to her that he was not responsible and, therefore, should not be on the jury. The judge "found that to be true and [had] no quarrel with that exclusion." It is clear that the judge was drawing upon his own observation of the venireperson and, therefore, under the deferential standard of review to be applied, we cannot say that this venireperson's exclusion was racially motivated.

The State's second challenge was exercised against Reesie Williams. The prosecutor stated that due to the fact that Mrs. Williams is a 65-year-old housewife who rents her apartment, has been a widow for 42 years, and has a grown-up daughter, she believed her "limited

background" would make her a bad juror. The trial judge said "okay." We concede that a juror's background is relevant and will necessarily affect her view of the evidence presented in a case. However, to say that a 65-year-old widow and mother of one who rents her apartment automatically has a "limited background" making her unfit to be on a jury is unacceptable. Such reasoning is nonsensical and completely meaningless without further explanation. Although the State's explanation need not rise to the level of a challenge for cause, the prosecutor must do more than merely list a series of unrelated facts to rebut a defendant's *prima facie* showing of purposeful racial discrimination. (*Harris*, 129 Ill. 2d at 184, 544 N.E.2d at 384.) The reason set forth by the State is far from the "clear and reasonably specific" race-neutral explanation the State must present in order to meet its burden.

The State also peremptorily challenged Grace Duison. The prosecutor stated that Mrs. Duison was divorced and had sons the approximate age of defendant. In fact, Mrs. Duison had two sons ages 20 and 16 and a daughter who was age 30. At the time of trial, defendant was 27 years old. The judge determined that these reasons were a legitimate basis upon which to base a peremptory challenge because Mrs. Duison might identify with defendant. The relevant exchange between the court and the prosecutor at the *Batson* hearing reads as follows:

> "MS. BUGLASS [Assistant State's Attorney]: As to Grace Duison, that was our fourth challenge. She has sons that are approximately the age of the defendant, and she is divorced.
>
> THE COURT: Okay. For those reasons you felt she might identify with the defendant and not be able to give you a fair and impartial trial?
>
> MS. BUGLASS: Yes.
>
> THE COURT: So you used one of your peremptory challenges?
>
> MS. BUGLASS: Yes."

Defendant argues, however, that several white jurors who were accepted by the State had the same characteristics as Mrs. Duison. He asserts, therefore, that it must be presumed that the prosecutor's reason for striking her was "merely a pretext to hide a racial motivation." (*Young*, 128 Ill. 2d at 23, 538 N.E.2d at 458.) Defendant points out that juror Jack Norris had two sons, ages 32 and 20. Norris also had a daughter who was 23 years old. Defendant also points out that juror John Perkins, who was separated from his wife, had five children, the youngest between 20 years old and 30 years old. Addition-

ally, the record shows that juror James Swanson was 27 years old and juror Larry Young was 24 years old.

The mere fact that the State challenges a black venireperson for reasons which are equally applicable to an accepted white venireperson does not show in and of itself that the offered explanation is pretextual. (*People v. Hooper* (1989), 133 Ill. 2d 469, 511, 552 N.E.2d 684, 701.) The accepted white venireperson may have had some other characteristic which, in the mind of the prosecutor, made that person more desirable as a juror. (*Young*, 128 Ill. 2d at 23-24, 538 N.E.2d at 458-59.) This contention by a defendant, however, cannot be "lightly dismissed." (*Young*, 128 Ill. 2d at 23, 538 N.E.2d at 458.) Moreover, if evidence exists of common characteristics between challenged black veniremembers and accepted white veniremembers, the trial court should give this evidence "great weight *** in evaluating the State's explanations." *Harris*, 129 Ill. 2d at 180, 544 N.E.2d at 382.

In fact, this contention was given no weight by the trial judge, who did not even give the defense arguments passing consideration. The record is clear that he did not consider the characteristics of the white jurors who were accepted by the State when he ruled that there was no discrimination. The prosecutor offered no explanation as to why, for example, juror Jack Norris would not "identify" with the 27-year-old defendant even though he had two sons ages 32 and 20, but Grace Duison would "identify" because she had two sons ages 20 and 16. Therefore, without considering all the relevant factors, the trial judge held that there was no intentional discrimination. The trial judge clearly failed to undertake " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case.' " *Harris*, 129 Ill. 2d at 174-75, 544 N.E.2d at 380, quoting *Hall*, 35 Cal. 3d at 167, 672 P.2d at 858, 197 Cal. Rptr. at 75.

Additionally, as stated above, the prosecutor must do more than simply list a series of facts. (*Harris*, 129 Ill. 2d at 184, 544 N.E.2d at 384.) A trial judge cannot presume or infer from the facts listed by the prosecutor "that an unarticulated neutral explanation exists." (*Harris*, 129 Ill. 2d at 184, 544 N.E.2d at 384.) "Rather, a court must focus its inquiry on the reasons actually articulated by the State." *Harris*, 129 Ill. 2d at 184, 544 N.E.2d at 384.

As illustrated by the above exchange between the trial judge and the assistant State's Attorney, the prosecutor merely listed several facts about Mrs. Duison. The trial judge then inferred from the facts stated that the State felt Mrs. Duison would be prejudiced against it and identify with defendant because her sons "are approximately the age of the defendant, and she is divorced." (Since there is no evidence

that defendant was divorced, presumably it was the fact that Mrs. Duison's sons were approximately the same age as defendant that would have prejudiced her.) Therefore, without a race-neutral explanation *being offered by the State*, it was error for the trial judge to conclude that the prosecutor rebutted defendant's *prima facie* showing of purposeful discrimination based solely on the fact that Mrs. Duison was divorced and had children of the defendant's age.

The third and fifth black venirepersons the State challenged were Lemont Johnson and Malaka Moore. In regard to Mr. Johnson, the prosecutor stated that "[t]he way he sat there, the way he was waiting for his name to be called" indicated to her that he would not be a fair juror. As for Mr. Moore, who was a park district attendant, the prosecutor stated that she challenged him because she did not like his tone of voice, his attitude, or the way he answered the question about knowing police in the park.

Historically, demeanor, body language, and manner have been important factors in jury selection and constitute legitimate, racially neutral reasons for exercising peremptory challenges. (*Young*, 128 Ill. 2d at 20, 538 N.E.2d at 457.) However, such demeanor-based explanations "must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race." (*Harris*, 129 Ill. 2d at 176, 544 N.E.2d at 380.) In *Harris*, the trial judge held that the prosecutor's explanation that a challenged juror was "meek and sleepy" and did not answer questions in a forthright manner was a legitimate race-neutral explanation. The judge stated for the record, however, that he was aware of the problems inherent in such subjective explanations. (*Harris*, 129 Ill. 2d at 176, 544 N.E.2d at 380.) The Illinois Supreme Court found nothing erroneous in his ruling in light of the fact that he "closely scrutinized the State's explanations." *Harris*, 129 Ill. 2d at 176, 544 N.E.2d at 380.

In this case, the record clearly shows that the trial judge did not "closely scrutinize" the prosecutor's explanations. In fact, several times he coached the prosecutor by explaining or developing the reasons given by the prosecutor or simply articulating a "race-neutral" reason for the prosecutor, who merely agreed. In addition, the judge's disdain for the *Batson* decision was manifest. During his diatribe on "the worst decision ever handed down," the judge alternately calls the decision "poorly written, poorly understandable, and certainly wrong" and "ludicrous and ridiculous." The fact that a judge may have "strong feelings" against the *Batson* decision and inappropriately expresses them does not necessarily mean that a defendant will

not get a fair hearing from him. (See *Hooper*, 133 Ill. 2d at 513-14, 552 N.E.2d at 702-03.) However, the trial judge's statements in this case indicate that he believes it nearly futile to attempt to apply this "poorly understandable" decision, because "[w]hy in the world anyone will indicate in *Batson* that blacks are systematically excluded is beyond me." Additionally, immediately after concluding that the State's reasons for its challenges were not racial and having the defense put its objections into the record, the judge opined to defense counsel that

"the same argument that you make can be made by the State that you excluded white people because of their last name, because of where they lived. Generally speaking, people that live in Bridgeview or Bridgeport are white and are prejudiced against black people. *So you didn't take a chance either*, and that's why we have peremptory challenges, and that's why I think the *Batson* ruling and the *Batson* hearings are ludicrous and ridiculous." (Emphasis added.)

The trial judge did not undertake a " 'sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case.' " (*Harris*, 129 Ill. 2d at 174-75, 544 N.E.2d at 380, quoting *Hall*, 35 Cal. 3d at 167, 672 P.2d at 858, 197 Cal. Rptr. at 75.) He merely took the prosecutor's explanations at face value, did not consider the relevant surrounding circumstances and made only two findings of fact: (1) that the State's explanations for its challenges were nonracial, and (2) that *Batson* was a bad decision. We hold that, even under a deferential standard, the trial judge's first conclusion must be reversed as clearly erroneous and the defendant provided with a new trial. We obviously lack jurisdiction to address the court's latter finding. In order that the reader be not overly critical of the trial court, it must be pointed out that jury selection in this case preceded the published opinions of every case cited by us as a basis for reversal on this issue.

Even though we reverse defendant's conviction and remand for a new trial on the *Batson* issue, we will address defendant's remaining arguments since they may recur and also in order to prevent any future assertions of double jeopardy.

## II

Defendant's second argument is that "his statements to the prosecutor should have been suppressed because after his arrest he explicitly invoked his right to counsel; hence, [his] statements were involuntary and *** obtained in violation of [his] rights under the V, VI, and XIV amendments." The State contends that even if defendant's state-

ments were obtained in violation of *Miranda*, they were properly used only for impeachment purposes. Alternatively, the State maintains that defendant waived his right to counsel by initiating a conversation with an assistant State's Attorney and, therefore, his statements were constitutionally obtained.

It must first be noted that defendant has confused the difference between a statement taken in violation of *Miranda* and a statement that is involuntary. The standards established in *Miranda* "have a separate constitutional status apart from considerations of voluntariness." (*People v. Doss* (1975), 26 Ill. App. 3d 1, 14, 324 N.E.2d 210, 219.) At the pretrial hearing on defendant's motion to suppress, defense counsel specifically acknowledged that "we are contesting a *Miranda* violation here, not a voluntary violation." Additionally, the argument defendant presents in his brief is simply that he expressly invoked his right to counsel and, therefore, the statements he made to the prosecutor prior to speaking with an attorney should have been suppressed. Only in the opening sentence and the last sentence of his argument does defendant make the conclusory assertion that "since [his] statements were obtained in clear violation of his constitutional right to counsel, [they] were involuntary and totally inadmissible." In light of the fact that defendant has confused his argument by blurring the line between a statement taken in violation of *Miranda* and a statement which is coerced, three questions are raised. First, whether defendant's statement was involuntary. Second, whether defendant's statement was taken in violation of *Miranda*. Third, assuming defendant's motion to suppress should have been granted, whether admission of the statement was harmless error.

We first will address the issue of voluntariness. A trial court's determination that a statement was voluntary should not be reversed unless it is against the manifest weight of the evidence. (*People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 163, 586 N.E.2d 292, 307; *People v. Young* (1990), 206 Ill. App. 3d 789, 806, 564 N.E.2d 1254, 1266.) A statement made freely and without compulsion is voluntary. (*Young*, 206 Ill. App. 3d at 805-06, 564 N.E.2d at 1266.) Additionally, it is the trial court's province to resolve conflicts in the evidence and assess the credibility of witnesses. *Fauntleroy*, 224 Ill. App. 3d at 163, 586 N.E.2d at 307.

In this case, there is no evidence that defendant was coerced into giving his statements. The only argument defendant advances is that since he invoked his right to counsel, his statement was involuntary and should have been suppressed. Such a conclusory statement is clearly insufficient. The trial court expressly found that defendant's

statements were voluntary and we will not disturb that finding on review.

■■ Additionally, after reviewing the record, it is apparent that we need not address the issue of whether defendant's statement was taken in violation of *Miranda*. Even assuming defendant's right to counsel was violated, the trial court's failure to grant the motion to suppress was harmless error. In *Harris v. New York* (1971), 401 U.S. 222, 224, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645, the United States Supreme Court held that the prosecution is not necessarily barred from impeaching a defendant with statements which are inadmissible in the State's case in chief. "Only where there is reason to doubt the reliability of the evidence, as in the case of the traditional involuntary confession, is the evidence inadmissible for all purposes." (*Doss*, 26 Ill. App. 3d at 13-14, 324 N.E.2d at 219.) Therefore, a statement which is involuntary or coerced is inadmissible for all purposes including impeachment because such a statement does not satisfy legal standards of trustworthiness. (*Harris*, 401 U.S. at 224, 28 L. Ed. 2d at 4, 91 S. Ct. at 645; *Doss*, 26 Ill. App. 3d at 13-14, 324 N.E.2d at 219.) A statement taken in violation of *Miranda*, on the other hand, is barred under the exclusionary rule in order to deter police misconduct, not because it is viewed as unreliable. (*Harris*, 401 U.S. at 224-25, 28 L. Ed. 2d at 4, 91 S. Ct. at 645; *Doss*, 26 Ill. App. 3d at 13-14, 324 N.E.2d at 219.) As the Court stated in *Harris* (401 U.S. at 226, 28 L. Ed. 2d at 5, 91 S. Ct. at 646), "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." Therefore, if defendant's voluntary statement should have been suppressed under *Miranda*, it still would have been admissible as impeachment evidence.

In the instant case, the State never used the defendant's statements in its case in chief. The statements were only used to impeach defendant's testimony after he took the stand in his own defense. In addition, at the instruction conference, the trial judge refused Illinois Pattern Jury Instructions, Criminal, No. 3.06—3.07 (2d ed. 1981) (hereinafter IPI Criminal 2d), which concerns the weight the jury may give a prior statement made by a defendant when that statement is used as substantive evidence. The judge determined that the State only used defendant's statement as impeachment evidence and instead gave IPI Criminal 2d No. 3.11 on impeachment by a prior statement. Therefore, even if defendant's statement was suppressed, it still would have been admissible to impeach him. Consequently, assuming defendant's statement was taken in violation of his fifth amendment

right to counsel, we conclude that the trial court's failure to grant the motion to suppress was harmless error where the State only used defendant's voluntary statement as impeachment evidence.

## III

Defendant's third contention is that his conviction for armed robbery should be reversed because he was not proven guilty beyond a reasonable doubt. His argument centers on the fact that there were discrepancies between the testimony of the complainants and the statements they gave to the police at the time of the incident. Defendant points out that at trial Joyce testified that defendant took her glasses, but in her statement to police she said codefendant Williams stole them. In addition, both women testified that defendant shouted at Joyce "shut up, white bitch!" and that, as he fled, he ran up to the station attendant and threatened to come back. These details were not included in the women's statements to the police. Based on these inconsistencies, defendant asserts that the evidence was insufficient to prove him guilty beyond a reasonable doubt.

When reviewing a judgment of conviction, an appellate court must view the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, 472-73, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) It is not the province of the appellate court to retry a defendant and substitute its judgment for the judgment of the jury who heard the evidence and observed the witnesses. (*People v. Boclair* (1989), 129 Ill. 2d 458, 474-75, 544 N.E.2d 715, 722; *Young*, 128 Ill. 2d at 51, 538 N.E.2d at 473-74.) Therefore, a jury verdict will only be reversed on appeal if it is so improbable or unsatisfactory that it raises a reasonable doubt as to the defendant's guilt. (*Young*, 128 Ill. 2d at 51, 538 N.E.2d at 474.) As a result, any discrepancies in a witness' testimony go to its weight as evidence and "the trier of fact may believe as much or as little [of the testimony] as it pleases." *People v. Beasley* (1977), 54 Ill. App. 3d 109, 114, 369 N.E.2d 260, 264.

■ After reviewing the record in the light most favorable to the prosecution, we cannot say that the discrepancies in the complainant's statements made the evidence so improbable and unsatisfactory that no rational trier of fact could have concluded that the defendant was guilty of armed robbery beyond a reasonable doubt. The jury is charged with weighing the evidence and assessing the credibility of the witnesses. All three complainants identified defendant as one of

the men who robbed them. Additionally, defendant admitted at trial that he was there, that he attacked Michael Babuskow, and that he threw a garbage can through the back window of Michael's car before fleeing on foot. The jury could have rationally concluded that immediately after being robbed at gunpoint the complainants understandably failed to mention several extraneous details or that the police merely neglected to write down every detail.

## IV

Defendant's final argument is that the trial judge abused his discretion in sentencing defendant to a 20-year prison term. He maintains that such a sentence is "draconic" given defendant's background and the circumstances of this case and asserts that the trial judge "did not give great weight to the defendant's absence of a significant prior criminal record and his potential for rehabilitation." Defendant also contends that since his sentence is extremely disproportionate to the seven-year sentences imposed on his codefendants, the trial judge "clearly *** penalized [him] for exercising his right to a jury trial." The State maintains that the trial judge properly exercised his discretion in sentencing defendant within the statutory guidelines after weighing the appropriate aggravating and mitigating factors. The State further maintains that defendant was not disproportionately sentenced in comparison to his codefendants.

Sentencing a defendant is a matter of judicial discretion and, therefore, if within statutory limits, a sentence will not be disturbed on appeal unless the trial judge abused his discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883; *People v. Conley* (1983), 118 Ill. App. 3d 122, 133, 454 N.E.2d 1107, 1116.) The reason we review the sentence under this standard is because after seeing the evidence and viewing the defendant, the trial judge is "in a better position to determine the punishment to be imposed." (*Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) If an abuse of discretion is shown, Supreme Court Rule 615(b)(4) gives the reviewing court the power to reduce the sentence without remanding the case. (134 Ill. 2d R. 615(b)(4).) We will not substitute our judgment, however, for that of the trial court simply because we would have imposed a different punishment. *Perruquet*, 68 Ill. 2d at 156, 368 N.E.2d at 885.

The Illinois Constitution mandates that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11; Ill. Rev. Stat. 1991, ch. 38, par. 1001—1—2; *People v. La Pointe* (1981), 88 Ill. 2d 482, 493, 431 N.E.2d 344, 349.)

The Illinois legislature has categorized armed robbery as a Class X felony punishable by not less than six years nor more than 30 years' imprisonment. (Ill. Rev. Stat. 1991, ch. 38, pars. 18—2, 1005—8—1(a)(3).) In determining a sentence within these limits, the trial judge must balance the interests of society in discouraging such antisocial behavior against the rehabilitative potential of the defendant. (*Perruquet*, 68 Ill. 2d at 155, 368 N.E.2d at 884; *People v. Mick* (1980), 86 Ill. App. 3d 1022, 1029-30, 408 N.E.2d 1079, 1086.) There have been situations where courts have reduced sentences which were within the statutory limits because the punishment "greatly diverg[ed] from the purpose and spirit of the law." *People v. Nelson* (1982), 106 Ill. App. 3d 838, 846, 436 N.E.2d 655, 661; *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 648, 364 N.E.2d 491, 493-94.

■ A careful review of the record clearly indicates that, although we may have imposed a different punishment, the trial judge properly considered all relevant factors offered in mitigation and aggravation and the sentence imposed, in and of itself, was not inappropriate. At defendant's sentencing hearing, the State presented in aggravation that defendant had previously received two years probation for robbery in 1979 and three days in the House of Corrections for aggravated assault of a police officer in 1983. (The record and the State's brief incorrectly give the date of the assault as 1973; in 1973 defendant was 12 years old.) In mitigation, defendant offered the testimony of Ted Milos, defendant's employer, and the testimony of Linda Banks, defendant's mother. Ted testified that defendant had worked for him at the Water Tower Car Wash for three years and was a very good, reliable, and trustworthy employee. He also testified that defendant had come out to his home several times on weekends to do some work and that upon defendant's release he will rehire him. Mrs. Banks testified that defendant lives in a house with her, his wife and two children, Kiara and Robert, Jr., and his paralyzed sister, Jody. She testified that Jody needs constant care, has no control over her bodily functions, and must be catheterized every four hours. She stated that the family is dependent upon defendant to help care for Jody. Defense counsel requested that the court sentence defendant to eight years, but no more than 10 years.

The trial judge stated that six years would be an appropriate sentence if this were defendant's first offense. However, in view of defendant's criminal record and the facts of the case, the judge stated that "there is not enough time under the new law to give to this gentleman." He concluded that the nature of the offense indicated to him that "the only way in which to rehabilitate this young man is to house

him for a very long time." Therefore, he determined that 30 years was an appropriate sentence. The judge then recognized the hardship that incarceration would have on the defendant's family, but also noted the pain caused to the victims of defendant's crime. Finally, considering the mitigating evidence of defendant's home and work life and his statement to the court that he was sorry for what he had done, the judge sentenced defendant to 20 years' incarceration. The judge urged defendant to take advantage of the facilities available in the penitentiary and to contemplate what he would do when he was released. The trial record clearly indicates that the judge thoughtfully considered the aggravating and mitigating evidence and fashioned a sentence which, in his valid discretion, struck a balance between the interests of society and the desire to rehabilitate the defendant.

■■ In addition, defendant argues that the "shocking disparity" between his 20-year sentence and the seven-year sentences imposed upon his codefendants who all pleaded guilty "indicates quite clearly that [he] was penalized for exercising his right to a jury trial." This argument is meritless. It is of course improper for a trial judge to impose a more severe sentence than he normally would have simply because defendant exercised his constitutional right to a jury trial. (*People v. Martin* (1970), 47 Ill. 2d 331, 339, 265 N.E.2d 685, 689; *People v. Hoffman* (1974), 25 Ill. App. 3d 261, 265, 322 N.E.2d 865, 869.) However, the "mere fact" that a defendant convicted by a jury received a greater sentence than a codefendant who pleaded guilty "does not justify the conclusion that the greater sentence was imposed because of the election to stand trial." (*Hoffman*, 25 Ill. App. 3d at 266, 322 N.E.2d at 869.) Yet the "mere fact" that he received a much greater sentence than his codefendants is all the evidence the defendant offers. Clearly, the record itself does not support this bold assertion. Most importantly, however, the fact that defendant was tried and sentenced before any of his codefendants had even pleaded guilty completely destroys the precarious foundation upon which this argument already teetered.

■■ As stated above, there is no evidence defendant was charged a "jury tax" or that the trial judge abused his discretion in sentencing defendant to 20 years' incarceration. We conclude that the sentence is still improper, however, in light of the sentences ultimately given to his codefendants. The defendant did not expressly make the argument that he was denied the equal protection of the law, but he touched upon it by comparing his sentence to those of his codefendants. " 'Fundamental fairness and respect for the law require that defendants similarly situated may not receive grossly disparate sentences.' "

(*People v. Kline* (1981), 99 Ill. App. 3d 540, 553, 425 N.E.2d 562, 572, *aff'd in part & rev'd in part* (1982), 92 Ill. 2d 490, 442 N.E.2d 154, quoting *People v. Henne* (1973), 10 Ill. App. 3d 179, 180, 293 N.E.2d 172, 174.) However, the mere fact of a disparity between a sentence given to a defendant convicted in a jury trial and another imposed upon a defendant who pleaded guilty, without more, does not mandate a reduction in the greater sentence. (*Martin*, 47 Ill. 2d at 339, 265 N.E.2d at 689; *People v. Mick* (1980), 86 Ill. App. 3d 1022, 1028, 408 N.E.2d 1079, 1085.) A disparate sentence imposed upon a codefendant is only justified by " 'a more serious criminal record [citation] or greater participation in the offense [citation].' " (*Kline*, 99 Ill. App. 3d at 553, 425 N.E.2d at 572, quoting *People v. Martin* (1980), 81 Ill. App. 3d 238, 245, 401 N.E.2d 13, 18; see *People v. Kline* (1982), 92 Ill. 2d 490, 508, 442 N.E.2d 154, 163.) It must also be noted that it has been held in Illinois that a plea of guilty is a relevant mitigating factor. (*People v. Compton* (1990), 193 Ill. App. 3d 896, 902, 550 N.E.2d 640, 644.) In addition, the fact that a defendant was sentenced prior to his codefendants and by a different judge does not preclude him from challenging his sentence under these "disparate sentencing" principles. *Kline*, 99 Ill. App. 3d at 554, 425 N.E.2d at 572.

In the instant case, four persons robbed Joyce, Diane, and Michael. According to the victims, all four men equally participated in the beating of Michael.

As previously stated, after a jury trial defendant was sentenced to 20 years in the Illinois Department of Corrections. He was sentenced on June 28, 1988, by Judge Ronald Himel. The evidence introduced in aggravation and mitigation is clearly set out above.

Codefendants O'Neal Johnson, Gene Jones and Frank Williams pleaded guilty and each was sentenced to seven years in the Illinois Department of Corrections on January 12, 1989, by Judge William Hibbler. The evidence set out in aggravation and mitigation is set out below.

Defendant O'Neal Johnson had received two years' felony probation for burglary in May 1982, three years' incarceration in the Department of Corrections for possession of burglary tools in October 1982, a conviction for theft in 1985, and a conviction for burglary in 1989. In mitigation, counsel stated that defendant Johnson was 26 years old, had a fiancee and one child and was present in court on each and every court date with his mother.

Defendant Gene Jones had a misdemeanor conviction for theft in March 1982, had received two years probation for burglary in 1982,

had received seven months' incarceration in the Cook County jail for theft in 1984, and, at the time of sentencing in the instant case, was serving four years on a burglary charge. In mitigation, counsel stated that defendant Jones was an "admirable young man *** [who] regrets what happened."

Defendant Frank Williams apparently had no criminal record or, at least as it was expressed to the trial judge, "the least background of the gentlemen standing in front of you."

The trial judge then accepted the recommendation of the State and sentenced each defendant to seven years in the Illinois Department of Corrections.

Clearly, defendant received a disparate sentence which is not justified under the factors set out above. First, his criminal record was not as extensive as that of either codefendant Jones or codefendant Johnson. Additionally, the evidence introduced in mitigation was much more detailed and illustrated greater rehabilitative potential than that introduced on behalf of Jones, Williams, or Johnson. It is absolutely acceptable for a defendant who pleads guilty and saves the State the expense of proving his culpability to be sentenced to a lighter sentence than he may otherwise have received if he had proceeded to trial. However, a disparity of the degree in this case where the defendants all equally participated in the crime and where their criminal records were substantially similar is "fundamentally unfair." Therefore, we conclude that a sentence of 20 years' incarceration was excessive in view of the sentences given to his codefendants.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Reversed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.